[Cite as *State v. Johnson*, 2011-Ohio-994.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 9-10-47

    v.

KIRBY JOHNSON,                        **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 09CR0440

**Judgment Affirmed**

**Date of Decision: March 7, 2011**

APPEARANCES:

    *Robert C. Nemo* **for Appellant**

    *Brent A. Yager and David J. Stamolis* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Kirby Johnson ("Johnson"), appeals the July 16, 2010 judgment of the Common Pleas Court of Marion County, Ohio, finding him guilty of one count of trafficking in marijuana in an amount exceeding 1,000 grams, a third degree felony, in violation of R.C. 2925.03(A)(1), (C)(3), and sentencing him to five years in prison.

{¶2} The facts relevant to this appeal are as follows. In August of 2009, Dylan Hollar was found in possession of a substantial amount of marijuana by law enforcement. In an effort to avoid being sent to prison, Hollar informed officers with the MARMET drug task force in Marion, Ohio, that he was willing to be a confidential informant and that he could buy six to eight pounds of marijuana from Johnson, who lived in Cleveland, Ohio. Hollar then contacted Johnson by phone and asked Johnson if he had any marijuana that he could sell. Johnson indicated that he did and that he would be able to drive to Marion that day to bring it to him. This call was recorded by MARMET.

{¶3} Although Johnson indicated that he could deliver the marijuana to Hollar that day, he was not able to do so. The following day, Hollar and Johnson agreed to meet in Marion to exchange the marijuana. This conversation was also recorded. However, this meeting did not occur either. After several attempts to

contact Johnson over the next couple of days, he eventually told Hollar that he could bring the marijuana to him on August 24, 2009.

{¶4} On August 24, 2009, Johnson and Hollar spoke on multiple occasions to discuss where they were going to meet, how long it would take Johnson to drive to Marion, and where Johnson was located at various points during his trip to Marion. After discussing a number of places to meet to complete the transaction, the two agreed to meet at the Lowe's parking lot. While waiting on Johnson to come from Cleveland, Detective Dan Ice stayed with Hollar at a business located near Lowe's. When MARMET learned that Johnson was in the vicinity, Hollar left with his girlfriend, who was driving her car because Hollar did not have a valid driver's license, to go to the Lowe's parking lot. Det. Ice also went to the Lowe's parking lot in an unmarked car, as did a number of other officers. Prior to this time, MARMET had arranged for Hollar to have Johnson bring the marijuana to him inside of his girlfriend's car and then his girlfriend was to exit the vehicle, open the trunk, and walk away as a signal for MARMET that Johnson had in fact delivered the marijuana.

{¶5} Johnson arrived at the Lowe's parking lot in a green conversion van, which was driven by another individual. The van pulled alongside Hollar's vehicle, and Johnson exited the van carrying a white plastic bag. Johnson entered Hollar's vehicle through the rear passenger side door. Shortly thereafter, Hollar's

girlfriend exited the car and opened the trunk. The officers approached the vehicle, ordered Johnson out of the car, and secured it. Johnson was then placed under arrest and taken to a nearby patrol car. Johnson was informed of his *Miranda* rights, and he invoked his right not to speak to the officers. The officers also ordered the two occupants out of the green van, placed them under arrest, and questioned them.

{¶6} Inside Hollar's vehicle, MARMET found the white plastic bag that Johnson was carrying in the back seat. Inside this bag was a brown paper bag containing six clear plastic re-sealable bags, each containing what appeared to be marijuana. Later, another MARMET detective tested the contents of the re-sealable bags and found that they contained 2,433.80 grams of marijuana.

{¶7} On September 3, 2009, Johnson was indicted for one count of trafficking in marijuana in violation of R.C. 2925.03(A)(1), (C)(3)(a), a felony of the third degree. His arraignment was held on September 8, 2009, and he entered a plea of not guilty. According to the arraignment entry, Johnson had a probation holder on him from Cuyahoga County, Ohio, at that time. On September 9, 2009, Johnson's court-appointed counsel filed a request for a bill of particulars, a demand for discovery, and a request for notice of the prosecutor's intent to use evidence. The State responded to the demand for discovery and the notice of intent to use evidence eight days later.

{¶8} Initially, Johnson's trial was scheduled to begin on November 17, 2009. On November 9, 2009, the State filed a motion to continue the trial because the prosecutor assigned to the case had a scheduling conflict and was unavailable that day and the State wanted Johnson's trial to be conducted at the same time as the trials of his co-defendants (the other two occupants of the van). In this motion, the State noted that Johnson would not suffer any prejudice because he had recently fired his first attorney and retained a new attorney. However, Johnson's first attorney filed a response in opposition to this motion on Johnson's behalf. In this response, counsel stated that a hearing had been held on the matter of Johnson firing him and that the trial court ordered him to remain on the case until a new attorney entered an appearance. In addition, counsel stated that Johnson had requested that the trial court proceed with the previously scheduled jury trial date.

{¶9} The trial court granted the State's motion for a continuance and held that the time for speedy trial was tolled pursuant to R.C. 2945.72(H). The next date set for Johnson's trial was January 21, 2010. In the court's entry granting the continuance, it noted this new trial date was the first date available to all of the parties and the court.

{¶10} On November 19, 2009, Johnson's first attorney filed a motion to withdraw as counsel and attached a letter addressed to the trial court from Johnson wherein Johnson cited a number of issues he was having with counsel's

representation of him. The court granted the motion on December 2, 2009, after having held a hearing on the matter the previous day. Johnson was then appointed a new attorney.

{¶11} On January 14, 2010, Johnson's second attorney filed a motion to withdraw as counsel. After a hearing on the matter, the trial court overruled this motion.[1] Sometime that same day, Johnson told a correctional officer at the jail, Dan Lehman, that he wanted to speak to a MARMET officer. At that time, two MARMET detectives, Christy Utley and Ryan Ward, were in the booking area of the jail on an unrelated matter. C.O. Lehman informed the officers that Johnson wanted to speak with them, and they indicated that they could speak to him then.

{¶12} Johnson was then brought to the booking area. Det. Ward and Johnson stepped into a side room where the inmates' jail clothing is kept, and Det. Ward said, "What's up." Johnson told him that he had been in jail for five months, that he was tired of being in jail, that Hollar called him for marijuana, that he made a few phone calls, came down to Marion with the marijuana, and now he was in jail but that he was only supposed to make $200.00 out of the transaction with Hollar. Det. Ward told Johnson that he did not know what Johnson was being offered in his case, and Johnson told him that the State was offering three

---

[1] The judgment entry reflects that the hearing regarding counsel's motion to withdraw was held on January 13, 2010, but that the written motion was actually filed the following day, as was the entry overruling this motion.

years but that he was willing to plead to a fourth degree felony with eighteen months imprisonment. He further told Det. Ward that his first attorney lied to him so he was able to get the judge to give him a new attorney but that the new attorney was not doing anything for him and he simply wanted to get this case resolved. He also offered to work with MARMET, but Det. Ward told him that MARMET would be hesitant to do that because he was from Cleveland and that Johnson would have to speak to his lawyer to see about arranging something. This conversation lasted approximately three to five minutes. Shortly after this conversation, the prosecutor contacted Johnson's counsel to inform him of Johnson's statements to Det. Ward and sent him a copy of Det. Ward's report of the conversation the next day.

{¶13} The following week, one day before Johnson's scheduled trial, a pre-trial was held. At this time, Johnson's attorney renewed his motion to withdraw as counsel. Johnson's attorney provided the trial court with a number of reasons for the motion to withdraw, including informing the court that he spoke with Johnson that weekend and that Johnson told him things about his conversation with Det. Ward. However, when counsel spoke with Johnson on the morning of the pre-trial, he gave counsel a different explanation of his conversation with Det. Ward. As a result, Johnson's counsel stated that he would have a problem in pursuing the necessary motion to suppress Johnson's statement because he was unsure of

whether he could advance some of the arguments that Johnson now wanted him to advance in light of his discussion with Johnson the preceding weekend, which placed him in an awkward situation. Counsel then requested that the trial court continue the trial and schedule a suppression hearing.

{¶14} Johnson informed the trial court that he wanted to hire his own attorney from outside of Marion and that he could do so within two weeks. The trial court then discussed with Johnson that he had previously indicated to the court that he was going to privately retain counsel but never did and that if he did not, then the court would have to appoint someone, which would put them all "in the same boat" as before. (Hrg., 1/20/10, p. 11.) Johnson assured the court that he would definitely hire his own attorney this time. The trial court granted the request for a continuance, informed Johnson that a suppression hearing would be set in approximately three weeks, and told Johnson that his new attorney would need to enter his appearance as soon as he was retained so that the hearing could be coordinated with the new attorney's schedule. In the meantime, the trial court directed Johnson's second attorney to remain on the case until such time as new counsel was retained and to file the motion to suppress.

{¶15} On January 25, 2010, Johnson's second attorney filed a motion to suppress. On January 28, 2010, the trial court scheduled a hearing on the motion to suppress for February 25, 2010. On February 22, 2010, counsel for Johnson

(still the second attorney) filed a motion to continue the suppression hearing because he was currently in an aggravated murder trial in Franklin County Common Pleas Court, which had been set for the week before but was moved to the following week because of scheduling issues with that court. That same day, counsel for Johnson also filed another motion to withdraw as counsel. In this motion, counsel stated that Johnson was insisting upon testifying at the suppression hearing and at trial, which would place counsel in a "very difficult position that will make matters worse for the Defendant," and that counsel believed it was not only necessary but required that counsel for Johnson be substituted.

{¶16} The trial court set a pre-trial date for March 8, 2010, and a trial date for March 23, 2010, and the suppression hearing set for February 25, 2010, was not conducted. On March 5, 2010, a third attorney entered his appearance on behalf of Johnson. Consequently, the second attorney's motion to withdraw as counsel was granted. On March 15, 2010, Johnson's new counsel filed a motion to suppress his statements and a motion to compel discovery. In addition, counsel filed a motion to continue the trial to allow for a suppression hearing to be held and for full discovery to be provided by the State. On March 17, 2010, the trial court granted the continuance. Two days later the court re-scheduled the trial date to May 13, 2010. The suppression hearing was re-scheduled for April 22, 2010.

However, on that day, the trial court *sua sponte* continued the suppression hearing because the court was in a trial. The suppression hearing was then scheduled for the following week.

{¶17} On April 29, 2010, the suppression hearing was held and the matter was taken under advisement. On May 12, 2010, the trial court continued the trial date because it was in another criminal trial and the court's docket was "congested." On May 25, 2010, Johnson's trial was scheduled for July 15, 2010. On June 16, 2010, the trial court overruled Johnson's motion to suppress the statements he made to Det. Ward.[2]

{¶18} On July 15, 2010, Johnson filed a motion to dismiss his case due to a violation of his right to a speedy trial. The trial court overruled this motion, and Johnson's jury trial began. The trial concluded the following day, and Johnson was found guilty. At Johnson's request, the court proceeded to sentencing and sentenced Johnson to five years in prison. This appeal followed, and Johnson now asserts six assignments of error for our review.

**FIRST ASSIGNMENT OF ERROR**

**THE TRIAL COURT DENIED APPELLANT HIS RIGHT TO A SPEEDY TRIAL CONTRARY TO THE UNITED STATES AND OHIO CONSTITUTIONS AND R.C. 2945.71(C).**

---

[2] Johnson also requested that certain statements that he made during a hearing regarding his second attorney's motion to withdraw as counsel be suppressed. No evidence as to these statements was given at the suppression hearing. After reviewing the motion to suppress, the trial court granted this portion of the motion, and these statements were not used at trial and are not at issue in this appeal.

**SECOND ASSIGNMENT OF ERROR**

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN SUSTAINING APPELLEE'S MOTION IN LIMINE WHICH EXCLUDED APPELLANT FROM PRESENTING TESTIMONY OF MARMET'S PRIMARY OFFICER'S DISCIPLINARY RECORD.**

**THIRD ASSIGNMENT OF ERROR**

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT, AFTER HAVING BEEN MIRANDIZED, CONCERNING ADMISSIONS OF GUILTY.**

**FOURTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO GIVE THE LESSER INCLUDED OFFENSE INSTRUCTION FOR POSSESSION OF MARIJUANA.**

**FIFTH ASSIGNMENT OF ERROR**

**THE JURY'S GUILTY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**SIXTH ASSIGNMENT OF ERROR**

**APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶19} For ease of discussion, we elect to address some of the assignments of error out of the order in which they appear.

*First Assignment of Error*

**{¶20}** Johnson first asserts that the trial court erred when it overruled his motion to dismiss for a violation of his right to a speedy trial. The Sixth Amendment of the United States Constitution as applied to the States through the Fourteenth Amendment, as well as Article I, Section 10 of the Ohio Constitution dually afford a defendant the right to a speedy trial. In Ohio, the right to a speedy trial is also statutorily defined. R.C. 2945.71-2945.73. Specifically, R.C. 2945.71(C)(2) states that a person who is charged with a felony must be brought to trial within 270 days after he is arrested. The day of arrest does not count when computing a speedy trial violation. See *State v. Masters*, 172 Ohio App.3d 666, 2007-Ohio-4229, 876 N.E.2d 1007, ¶ 12; Crim. R. 45(A). In addition, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E).

**{¶21}** If a defendant who is charged with a felony is not brought to trial within the required time period, the charge against him must be dismissed and the prosecution is barred from pursuing "any further criminal proceedings against [the defendant] based on the same conduct." R.C. 2945.73(B), (D). Once a defendant makes a prima facie showing that he was not brought to trial within the proper period, the burden shifts to the State to demonstrate that sufficient time was tolled

or extended under the statute. *Masters*, 2007-Ohio-4229, at ¶ 10, citing *State v. Butcher* (1986), 27 Ohio St.3d 28, 31, 500 N.E.2d 1368. The time is tolled if the defendant initiates certain actions in the court.

{¶22} Revised Code 2945.72 states, in pertinent part, that

**[t]he time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:**

**\* \* \***

**(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;**

**\* \* \***

**(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]**

R.C. 2945.72(E), (F), (H). These tolling events "do not unconditionally extend the time limit in which an accused must be brought to trial, but, rather, this limit is 'merely extended by the time necessary in light of the reason for the delay.'" *State v. Arrizola* (1992), 79 Ohio App.3d 72, 75, 606 N.E.2d 1020, quoting Committee Comment to H.B. 511. In reviewing "a speedy-trial issue, a court is required to count the days of delay chargeable to either side and determine whether the case was tried within applicable time limits." *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 8.

{¶23} Here, Johnson was arrested on August 24, 2009. Pursuant to R.C. 2945.71(C)(2), he had to be brought to trial by May 21, 2010, 270 days later.[3] As previously noted, Johnson was not brought to trial until July 15, 2010, 324 days after his arrest. Consequently, he has made a prima facie showing that his speedy trial rights were violated by 54 days. Thus, the next question is whether any tolling events occurred. Our review of the record reveals that several tolling events occurred, totaling in excess of 54 days.

{¶24} On September 9, 2009, Johnson filed a request for discovery, for a bill of particulars, and a notice of intent to use evidence. The State provided discovery and a notice of intent to use evidence on September 17, 2009. The Ohio Supreme Court has acknowledged "the well-established rule that requests for discovery and motions for bills of particulars are tolling events pursuant to R.C. 2945.72(E)[.]" *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, ¶¶ 18-20. This was not an unreasonable amount of time to respond to these requests, and the intervening eight days tolled the statutory time period, resulting in a remaining overage of speedy-trial-time of 46 days.

---

[3] The parties agree that the "triple count" provision of R.C. 2945.71(E) does not apply in this case because Johnson had a probation holder placed on him from Cuyahoga County. See *State v. Brown*, 64 Ohio St.3d 476, 479, 1992-Ohio-96, 597 N.E.2d 97.

{¶25} When the trial court re-scheduled Johnson's November 2009 trial date, following the State's request for a continuance,[4] the new trial date of January 21, 2010, was well within the 270-time period. In addition, the trial court noted that this date was the first date available to *all* the parties and the trial court. However, on November 19, 2009, Johnson's first attorney filed a motion to withdraw as counsel, thus tolling the time until the court could decide this motion. See *State v. Ward*, 5th Dist. No. 03 CA 60, 2004-Ohio-2323.[5] A hearing was held on this matter on December 1, 2009. The trial court granted the request the following day and appointed a new attorney for Johnson. This resulted in a thirteen-day delay, chargeable to Johnson, resulting in a remaining overage of speedy-trial-time of 33 days.

{¶26} At a pre-trial on January 20, 2010, Johnson's second attorney moved to withdraw as counsel. Among the number of reasons he provided, counsel informed the court that Johnson had recently made a statement to MARMET on January 14, 2010, that a suppression motion was necessary, and that he was in an awkward situation to present such a motion given the different information that Johnson had provided him that day from the information he provided the

---

[4] Given the number of continuances necessitated by Johnson's filings in this case, we decline to address the reasonableness of any delays specifically caused by the State.

[5] A number of appellate districts have held that a motion to withdraw as counsel for a defendant is a delay chargeable to the defendant for speedy trial purposes. See *State v. Matland*, 7th Dist. No. 09-MA-115, 2010-Ohio-6585, ¶ 42; *State v. Younker*, 4th Dist. No. 07CA18, 2008-Ohio-6889, ¶ 21; *State v. Allen*, 8th Dist. No. 90552, 2008-Ohio-5251, ¶ 14; *State v. Kemper*, 2nd Dist. Nos. 2002-CA-101, 2002-CA-102, 2004-Ohio-6055, ¶ 26.

preceding weekend. Counsel then requested that the trial be continued and that a suppression hearing be scheduled. When the court inquired of Johnson at that time, he told the trial court that he wanted to retain his own counsel and could do so within two weeks. The trial court granted the request for a continuance but did not allow Johnson's second attorney to withdraw until Johnson's new attorney entered an appearance. In addition, the trial court specifically informed Johnson that he needed to have his new attorney contact the court as soon as possible and that a suppression hearing would be set in approximately three weeks.

{¶27} Given the course of events, particularly Johnson's recent statement to MARMET and his desire to hire his own attorney, the granting of a continuance of the trial was in order and chargeable to Johnson. Further, the motion to suppress was filed five days later on January 25, 2010. The suppression hearing was then scheduled for February 25, 2010, and the trial was scheduled for March 23, 2010. These time frames were not unreasonable, and all of this time was properly chargeable to Johnson pursuant to R.C. 2945.72(E) and (H), particularly in light of the fact that the trial court notified Johnson that it could not schedule his suppression hearing, and consequently his trial, for a number of weeks.

{¶28} However, on February 22, 2010, Johnson's second attorney requested a continuance of the suppression hearing because he was in an aggravated murder trial in a different county, which had been moved from its

original date because of scheduling issues in that county. Counsel also filed another motion to withdraw that same day because of Johnson's insistence that he testify at the suppression hearing and that this placed counsel in a very difficult position that would make matters worse for Johnson if he were to testify, causing counsel to believe that he was required to withdraw. The continuance was granted and a pre-trial was scheduled for March 8, 2010. Thus, these motions also tolled the speedy-trial time.

{¶29} The amount of time from January 20, 2010, when Johnson's second attorney informed the court that he would be moving to suppress the statement Johnson made to MARMET and Johnson told the court that he would be hiring his own attorney, until the new date set for his trial, March 23, 2010, totaled 62 days—all chargeable to Johnson. This more than consumes the 33 days overage for speedy trial purposes that remained after calculating the other delays previously attributed to Johnson.

{¶30} Nevertheless, on March 5, 2010, Johnson's third attorney entered his appearance. This new attorney then filed a second motion to suppress on March 15, 2010, and requested that the March 23, 2010 trial date be continued so that a suppression hearing could be conducted. The continuance was granted, and a suppression hearing was scheduled for April 22, 2010, along with a re-scheduled trial date of May 13, 2010. The number of days between the filing of the second

motion to suppress and the date scheduled for the suppression hearing totaled 38 days, with an additional 21 days until the date scheduled for the trial (a total of 59 days). This total number of days was also chargeable to Johnson.

{¶31} In short, although the prosecution requested a continuance of the first scheduled trial and Johnson objected, his first re-scheduled trial was set well within the 270-day statutory time period. It was Johnson's own actions and problems arising between him and his previous attorneys that caused this case to be repeatedly continued beyond the statutory time period. In fact, not until April 22, 2010, when the trial court *sua sponte* ordered a continuance of the suppression hearing, did the trial court become the cause of a delay in bringing this case to trial. Even then, the court noted that it was in a trial at that time, and it delayed the suppression hearing by merely seven days, a reasonable continuance within the confines of R.C. 2945.72(H). The court held the hearing at that time, but it had not ruled upon the motion and was in another criminal trial when Johnson's May 13, 2010 trial date arrived. The court then continued his trial and noted that it was in another trial and that the court's docket was "congested." The court later ruled on the motion on June 16, 2010, 93 days after the motion was filed by Johnson's latest attorney and 48 days after it heard evidence on the motion.

**{¶32}** Notably, when the trial court overruled Johnson's motion to dismiss based on a speedy-trial violation, it specifically indicated that it had good reason for the delay in ruling upon the motion to suppress, stating,

> **although it took the Court longer than it normally would for a Motion to Suppress, in this particular case there was certainly good reason for that. During the time that the Motion was pending, this Court had two major trials, a five-day medical malpractice trial in the month of April and a six-day aggravated murder trial in this court in May which caused things to back up as far as the other work that was involved in this court. The Court has also dealt with very large number of felony filings in this court. One of the highest filing rates in the State. This year has been no different and that has piled up and caused delays as well.**

(Trial Trans., 7/15/10, p. 79.) We find that this explanation provided sufficient reasons for the trial court's delay in ruling upon this motion and that this delay was not unreasonable.

**{¶33}** In light of the reasons for the various delays, and that the motions filed on Johnson's behalf tolled the speedy-trial time by more than 54 days, we conclude that the trial court did not err in overruling his motion to dismiss for a violation of his speedy trial right. Accordingly, the first assignment of error is overruled.

*Third Assignment of Error*

**{¶34}** In his third assignment of error, Johnson maintains that the trial court erred in overruling his motion to suppress his statement to Det. Ward in January,

2010. Johnson contends that he invoked his right not to speak to law enforcement when he was arrested in August of 2009, and that Det. Ward is the one who initiated the interrogation in January, 2010, by asking Johnson, "What's up." However, Johnson does not dispute that he asked C.O. Lehman to allow him to speak with a MARMET officer.

{¶35} Initially, we note that appellate review of a decision on a motion to suppress evidence presents a mixed question of law and fact. *State v. Bressler*, 3rd Dist. No. 15-05-13, 2006-Ohio-611.

> **At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Carter*, 72 Ohio St.3d 545, 552, 651 N.E.2d 965, 1995-Ohio-104. When reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dunlap*, 73 Ohio St.3d 308, 314, 652 N.E.2d 988, 1995-Ohio-243. We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses," and then independently review whether the trial court applied the correct legal standard. *State v. Anderson* (1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.**

*Bressler*, 2006-Ohio-611, at ¶ 10.

{¶36} The United States Supreme Court has held that "an accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication,

exchanges, or conversations with the police." *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85; see, also, *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044. The accused "may also reinitiate such interrogation through the agency of a non-attorney third party." *State v. Van Hook* (1988), 39 Ohio St.3d 256, paragraph two of the syllabus, 530 N.E.2d 883.

{¶37} If the accused invokes his right to counsel, his subsequent statements may be used against him only if he "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois* (1984), 469 U.S. 91, 95, citing *Edwards*, 451 U.S. at 485-86, fn. 9. Whether the accused knowingly and intelligently waived his right to counsel "depends 'upon the particular facts and circumstances surrounding the case[.]'" *Bradshaw*, 462 U.S. at 1046, quoting *North Carolina v. Butler* (1979), 441 U.S. 369, 374-75; see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment, and the existence of threat or inducement are all factors to be considered). "The rationale of *Edwards* is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come *at the authorities' behest*, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and

not the purely voluntary choice of the suspect.'" (Emphasis added.) *Maryland v. Shatzer* (2010), ___ U.S. ____, 130 S.Ct. 1213, 1219, quoting *Arizona v. Roberson* (1988), 486 U.S. 675, 681.

{¶38} Here, Det. Ward testified that he placed Johnson under arrest on August 24, 2009, that he informed Johnson of his *Miranda* rights, and Johnson invoked those rights. Thereafter, Johnson received court-appointed counsel. However, C.O. Lehman testified that on January 14, 2010, Johnson told him that he wanted to speak with a MARMET officer and that Johnson made this request on his own without any sort of prompting by C.O. Lehman. C.O. Lehman was aware that MARMET officers were in the booking area so he told Det. Utley and Det. Ward that Johnson wanted to speak with one of them.

{¶39} Det. Ward testified that he and Det. Utley were at the jail for reasons that in no way involved Johnson, but he told C.O. Lehman that he would speak with Johnson at that time. Det. Ward further testified that he did not have any idea what Johnson wanted. When Johnson was brought to the booking area, Det. Ward then stated, "What's up," and Johnson proceeded to tell him that he had been in jail for five months, that he was tired of being in jail, and that he wanted to resolve the case. Johnson also explained the transaction with Hollar and that he was only supposed to receive $200.00 for his part. At some point, Det. Ward told Johnson that he did not know what the prosecutor was offering Johnson. Johnson then told

Det. Ward that the State was offering three years but that he would be willing to plead to a felony of the fourth degree and serve eighteen months. Johnson also told him that he would be willing to work for MARMET, but Det. Ward told him that MARMET would be hesitant to do that. Det. Ward testified that he did not ask Johnson any questions but that at some point he stated that Johnson's position seemed to be that of the "middle man," which Johnson confirmed. However, Det. Ward testified the conversation mostly consisted of Johnson "rattling on." (Supp. Hrg., 4/29/10, pp. 20, 27-28.) He also testified that Johnson told him that he thought his first court-appointed attorney lied to him, that he was able to have the court appoint him a second attorney, but that he did not feel that his new attorney was doing anything for him. This conversation lasted approximately three to five minutes. Neither the testimony of C.O. Lehman nor Det. Ward was disputed.

{¶40} Under these circumstances, we do not find that the *Edwards* rule was violated. Johnson requested, via a non-attorney third party, to speak with a MARMET officer. Although Det. Ward was the first to speak, stating, "What's up," he did not know what Johnson wanted. We do not find that this initiated the discussion between Johnson and Det. Ward. Rather, Johnson initiated the further communication, exchange, or conversation with Det. Ward when he told C.O. Lehman that he "wanted to talk to MARMET." Det. Ward's "question" was made simply in response to Johnson's request to speak with him and was not an attempt

to elicit an incriminating statement. In addition, Det. Ward's later statements to Johnson that he did not know what the State was offering Johnson and that Johnson's position seemed to be that of "middle man" both occurred after Johnson initiated the contact, told Det. Ward about his desire to resolve his case, and confessed to offering to sell marijuana to Hollar. Thus, these statements did not violate the *Edwards* rule either. See *Edwards*, 451 U.S. at 486, fn. 9 (noting that "in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred").

{¶41} As to the whether Johnson knowingly and voluntarily waived the right to counsel that he had previously invoked, we find that the evidence demonstrated a valid waiver of this right. Although Johnson invoked his right to an attorney, having requested and received an initial attorney and then a new attorney after being unsatisfied with his first attorney's representation, he clearly was electing to speak with law enforcement without the benefit of counsel, who he did not believe was adequately representing his interest, in an effort to resolve his case on his own. In fact, Johnson initiated this contact with MARMET one day after he was in court with his second attorney, who had requested that he be permitted to withdraw as Johnson's counsel because of significant disagreements

-24-

between Johnson and himself and Johnson's desire for a new attorney. Thus, Johnson knew full well of his right to counsel and was knowingly and voluntarily choosing to speak with Det. Ward without counsel. Further, Johnson had prior criminal experience as evidenced by the holder placed on him from Cuyahoga County for a probation violation. There was also no evidence that this three to five minute conversation was a lengthy or intense discussion or that during this time Johnson was mistreated, threatened, or physically deprived. Additionally, the trial court had spoken with Johnson on previous occasions and was able to ascertain his mental abilities, including the ability to waive his previously invoked right to counsel, and the record is devoid of any evidence that Johnson was limited in his cognitive abilities. Therefore, the trial court did not err in overruling Johnson's motion to suppress, and the third assignment of error is overruled.

*Fifth Assignment of Error*

{¶42} In Johnson's fifth assignment of error, he asserts that the jury's verdict was against the manifest weight of the evidence. An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing

so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶43}** In order to prove that Johnson committed the offense of trafficking in marijuana as charged in the indictment, the State had to prove beyond a reasonable doubt that Johnson sold or offered to sell marijuana in an amount exceeding 1,000 grams but less than 5,000 grams. See R.C. 2925.03(A)(1), (C)(3)(d).

**{¶44}** At trial, the State presented the testimony of Hollar, who testified that he acted as a confidential informant for MARMET in order to receive a lesser charge and, consequently, a lesser penalty for having been in possession of four pounds of marijuana. Hollar testified that he told MARMET officers that he could arrange to purchase six to eight pounds of marijuana from Johnson, who had sold to him on previous occasions. Hollar further testified that beginning on August 18, 2009, he and Johnson made a number of calls to one another and that they arranged for Johnson to sell six pounds of marijuana to him at a price of $1250.00 per pound. This transaction was supposed to occur initially on August 18, 2009,

with Johnson bringing the marijuana from Cleveland to Hollar in Marion but that Johnson cancelled that delivery. Another transaction was arranged the next day, but that also did not happen. After a number of calls, the transaction was scheduled for August 24, 2009.

{¶45} Hollar and MARMET Detective Dan Ice both testified that after making the arrangements for Johnson to deliver the marijuana to Marion on the 24th, they spent the next four to five hours with one another in the Rollerama parking lot, waiting on Johnson to arrive. During this time, Hollar spoke with Johnson a few times to find out where he was, when he expected to arrive in Marion, and where they would meet to exchange the marijuana. Also during this time, Det. Ice was in one vehicle and Hollar and his girlfriend were in another, but they exited their vehicles from time to time to smoke cigarettes and drink soda pop. Det. Ice testified that whenever Hollar called Johnson he stood next to Hollar's car door and at no point did he observe marijuana in that vehicle. Hollar also testified that there was no marijuana in his girlfriend's vehicle. Additionally, Det. Ice testified that Hollar did not appear to be intoxicated or under the influence of drugs, and Hollar testified that he was not using drugs or alcohol at the time of the transaction.

{¶46} Once Johnson told Hollar that he was in Marion and they arranged to meet at the Lowe's parking lot, Det. Ice followed Hollar and his girlfriend, who

was driving because Hollar did not a valid driver's license, to Lowe's and parked at a distance from them. Hollar testified that Johnson entered his girlfriend's car carrying a bag, that Johnson showed him the marijuana that was inside the bag, that his girlfriend exited the car, and that MARMET then swarmed the vehicle.

{¶47} Det. Ice, Det. Ward, and Officer Robert Musser each testified that they were in positions in the Lowe's parking lot that allowed them to view Hollar's vehicle. They each witnessed a green conversion van park next to Hollar's vehicle. They then saw Johnson exit the van carrying a white bag and enter Hollar's car. They also saw Hollar's girlfriend exit the car shortly thereafter and open its trunk, the sign that MARMET officers should converge on the car.

{¶48} Detectives Ward and Ice were the first to the car. Johnson was removed from the rear seat of the vehicle and the white bag that he brought into the car with him was found in the back seat. Inside the white bag was a brown paper bag, and inside of it were six re-sealable bags containing what appeared to be marijuana. The detectives removed the white bag from the car and then placed its contents on the trunk of the car. The substance found in these bags was later tested and weighed by Det. Utley and found to total 2,433.80 grams of marijuana. Det. Utley's report of the results of the testing she conducted were admitted into evidence without objection as State's Exhibit 8.

**{¶49}** The events that occurred in the Lowe's parking lot were all video recorded by Off. Musser, who was parked in the lot in a separate vehicle. In addition, a number of calls between Hollar and Johnson on August 18, 19, and 24, 2009, were recorded. Both the DVD of the transaction and the CD recordings of the calls were played for the jury and admitted into evidence. On these calls, there are two distinct voices, one that is Hollar's and the other identified by Hollar as that of Johnson.

**{¶50}** The calls on the 18th, admitted as State's Exhibit 1, reflect that Hollar called Johnson and began discussing that things have "dried up around here" and that he needed to "make a move." Johnson invites Hollar to come to Cleveland, but Hollar tells him that he has "no L's," meaning that he does not have a license. After some discussion, Hollar asks Johnson how much a "six-pack" will cost him and Johnson explains that for him to drive to Marion is going to cost Hollar "some numbers" and indicates that it will be "twelve fish." Hollar tells Johnson that he is willing to pay because, again, things have "dried up around here." Johnson then agrees to come to Marion that day. However, Johnson later informed Hollar that he could not come that day. Hollar testified that "six-pack" means six pounds of marijuana and that "twelve fish" means a price of $1250 per pound. Evident from these recordings and the testimony of Hollar about the slang terms used in these calls, is that Johnson is the one offering to sell and that Hollar is the buyer.

{¶51} The calls on the 24th, admitted as State's Exhibit 3, also reflect that Johnson is the seller and Hollar is the buyer. For example, as Hollar is questioning Johnson about his whereabouts and when he is going to arrive in Marion, Johnson says, "Don't give people my money," and Hollar tells him that people are calling him wanting to know "when it's gonna be there." State's Exhibit 3 also contains a recording of the conversation that transpired once Johnson entered Hollar's car at the Lowe's parking lot. On this recording, Johnson and Hollar can be heard talking about what is in the bag. More specifically, Hollar comments that the contents of the bags are not "chunky," which Off. Musser testified was a way of indicating that this is a higher quality of marijuana, and Johnson says, "I ain't gonna charge you no different."

{¶52} As for the video recording, admitted as State's Exhibit 4,[6] Det. Ice, Det. Ward, and Off. Musser testified that it accurately depicted what occurred in the parking lot of Lowe's on August 24, 2009. This video shows a white Lincoln, driven by Hollar's girlfriend, parked in a parking lot. Parked next to the passenger side of this vehicle is a green conversion van. An officer's voice is heard telling other MARMET officers that the suspect has exited the green van and is walking around it. Immediately thereafter, Johnson is seen walking around the back of the van, between the two vehicles, and then entering the white Lincoln through the

---

[6] A shorter "clip" of this video was also admitted as State's Exhibit 9. Both were played for the jury.

rear passenger door. Shortly after Johnson enters the vehicle, Hollar's girlfriend exits the same vehicle and opens the trunk. MARMET officers then converge on the vehicle, order Johnson out, and order the occupants out of the green van. The video also shows the white bag located in the rear of the Lincoln and the detectives emptying its contents on the trunk of the car, revealing six clear plastic re-sealable bags containing what appears to be marijuana.

{¶53} In addition to these recordings, the State also presented the testimony of Det. Ward regarding Johnson's statements to him on January 14, 2010, while in jail. As previously discussed, Johnson admitted to Det. Ward that he came to Marion to sell the marijuana to Hollar. In addition, Det. Ward testified that Johnson told him that he did not have any money, that Hollar called him to buy some marijuana, and that he called around for marijuana and then brought it to Marion to sell it to Hollar so that he could make $200.00.

{¶54} After reviewing all of this evidence, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. To the contrary, the evidence as outlined clearly supports the jury's finding of guilt. Not only did the recording of calls placed on August 18, 2009, demonstrate that Johnson is the one offering to sell six pounds of marijuana to Hollar, which would have been sufficient for a finding of guilt for trafficking in marijuana, but the DVD recording of Johnson

actually delivering over 2,000 grams of marijuana to Hollar overwhelmingly demonstrates that Johnson was guilty of trafficking in marijuana as charged in the indictment. Therefore, the fifth assignment of error is overruled.

*Fourth Assignment of Error*

{¶55} Johnson next contends that the trial court erred in failing to provide the jury with an instruction for the lesser-included offense of possession of marijuana rather than trafficking in marijuana. The Ohio Supreme Court has held that

> **the evidence in a particular case is relevant in determining whether a trial judge should instruct the jury on the lesser included offense. If the evidence is such that a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense, then the judge should instruct the jury on the lesser offense.**

*City of Shaker Hts. v. Mosley*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11, citing *State v. Shane* (1992), 63 Ohio St.3d 630, 632-633, 590 N.E.2d 272. "[I]n determining whether an offense is a lesser included offense of another, a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d

889, ¶ 26 (modifying *State v. Deem* (1988), 40 Ohio St.3d 205, paragraph three of the syllabus, 533 N.E.2d 294).

**{¶56}** Johnson was charged with trafficking in marijuana in excess of 1,000 grams but less than 5,000 grams, a felony of the third degree. See R.C. 2925.03(A)(1), (C)(3)(d). The *undisputed* evidence revealed that the amount of marijuana seized by MARMET during this transaction totaled 2,433.80 grams. Assuming arguendo that the evidence presented to the jury could have reasonably resulted in a finding of not guilty as to trafficking in marijuana but guilty as to possession of marijuana, the amount involved would render a possession charge a felony of the third degree as well. See R.C. 2925.11(A), (C)(3)(d). Both of these offenses carry the same penalty. See R.C. 2929.14(A)(3). Thus, the first prong of *Evans* is not satisfied in this instance as possession of marijuana in excess of 1,000 grams but less than 5,000 grams is not a lesser included offense of trafficking in marijuana in this amount. Accordingly, the fourth assignment of error is overruled.

*Second Assignment of Error*

**{¶57}** Johnson contends in his second assignment of error that the trial court erred when it granted the State's motion in limine to exclude evidence contained in Off. Musser's personnel file. More specifically, Johnson asserts that Off. Musser, the MARMET officer who arranged for Hollar to be a confidential

informant, had been disciplined and removed from MARMET for taking photographs of someone's unclothed wife from a cellular phone and transmitting these photos to others.[7] Johnson also asserts that Off. Musser made misrepresentations about this incident to other officers and asked other officers to be dishonest in their statements during the investigation of the taking of these photos. Johnson contends that he should have been permitted to cross-examine Off. Musser about this incident because it was for the purpose of attacking Off. Musser's character for truthfulness.

{¶58} Unless otherwise excluded by rule, statute, or constitutional provision, "[a]ll relevant evidence is admissible." Evid.R. 402. However, the admission of evidence is left to the discretion of the trial court. *State v. Awkal*, 76 Ohio St.3d 324, 1996-Ohio-395, 667 N.E.2d 960. A trial judge "must always bear in mind his or her responsibility to weigh the probative value of any relevant evidence against the danger of unfair prejudice," confusion of the issues, or of misleading the jury. *State v. Boggs* (1992), 63 Ohio St.3d 418, 423-424, 588 N.E.2d 813; Evid.R. 403(A).

{¶59} An appellate court will not disturb evidentiary rulings absent an abuse of discretion that produces a material prejudice to the aggrieved party. *State*

---

[7] The record is unclear about the particular circumstances at issue. More specifically, it is unclear whether these were photographs of Off. Musser's wife that were on his cellular phone and he allegedly transmitted them to others or if these were photographs of another officer's wife on the other officer's cellular phone that allegedly Off. Musser then took and transmitted to others.

*v. Roberts*, 156 Ohio App.3d 352, 2004-Ohio-962, 805 N.E.2d 594, ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in reaching its ruling. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (citations omitted).

**{¶60}** Evidence Rule 404(A)(3) provides, "[e]vidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609." Evidence Rule 608(B) provides, in pertinent part:

> **Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness[.]**

**{¶61}** In this case, Johnson's attorney did not present Off. Musser's personnel file to the court to demonstrate that the information he was seeking to inquire about was contained therein. Counsel simply informed the court that the file contained this information. However, he did not detail exactly what Off. Musser's misrepresentations were, what Off. Musser specifically asked of the other officers, or whether Off. Musser was reprimanded for the misrepresentations, the transmission of the photographs, or both. Thus, the precise information that may or may not have been probative of Off. Musser's character

for truthfulness or untruthfulness was not before the trial court and is not before us.

{¶62} Nevertheless, the representations of Johnson's counsel, as presented, that Off. Musser took photographs of someone's naked wife and then disseminated those photographs to other people is not probative of one's character for truthfulness or untruthfulness. It is, however, potentially inflammatory and could lead jurors to think poorly of Off. Musser's character in general. Thus, allowing Johnson to cross-examine Off. Musser on this issue could have easily led to unfair prejudice against a State's witness, and the trial court did not abuse its discretion in refusing to permit this line of questioning. However, whether Off. Musser misrepresented information to other officers during the investigation of this matter and asked other officers to be dishonest in that investigation would be probative of his character for truthfulness or untruthfulness. Therefore, this would have been a permissible subject for cross-examination.

{¶63} While this was a permissible subject, we are mindful that in order to find that this was reversible error we must conclude that the trial court's judgment was unreasonable, arbitrary, or unconscionable, not simply that the trial court erred in its judgment. In order to put Off. Musser's alleged misrepresentations and requests for other officers to be dishonest into context and to address his character for truthfulness or untruthfulness, the defense would have had to ask questions that

revealed the underlying circumstances in this investigation. As previously discussed, this information carried a danger of unfair prejudice. Further, the probative value of Off. Musser's character for truthfulness was not highly significant given the overall state of the evidence against Johnson. More specifically, this was not a case of "he said, she said," wherein Off. Musser's credibility was essential because the State's proof consisted solely of his "word." Rather, the State had the video and audio evidence, Hollar's testimony, Johnson's admissions to Det. Ward, and the additional testimony as to the events of August 24, 2009, from Det. Ward and Det. Ice. Thus, after weighing the probative value of this evidence against the danger of unfair prejudice, we cannot find that the trial court's decision to prohibit this line of questioning was unreasonable.

{¶64} Even if we assume arguendo that the trial court erred in preventing counsel from engaging in this line of questioning, any such error was harmless. An error in excluding evidence is harmless "if such evidence would not negate the overwhelming proof of defendant's guilt." *State v. Gilmore* (1986), 28 Ohio St.3d 190, 193, 503 N.E.2d 147; *State v. Williams* (1983), 6 Ohio St.3d 281, paragraph six of the syllabus, 452 N.E.2d 1323. As previously discussed, the evidence at trial overwhelmingly proved Johnson's guilt. Even if counsel for Johnson was permitted to cross-examine Off. Musser about misrepresenting the nude photograph incident and asking other officers to be dishonest about the incident as

well, there was no indication whatsoever that the recordings of the phone calls or of the Lowe's parking lot transaction were in some way falsified. In fact, both Det. Ice and Det. Ward testified that the video of the parking lot accurately reflected what occurred that night. As noted, the first phone call alone was sufficient evidence of Johnson's guilt, and the actual delivery of the marijuana by Johnson and his confession to Det. Ward that he sold marijuana to Hollar in order to earn $200.00 were, essentially, conclusive. Thus, any character for untruthfulness of Off. Musser that may have been raised by this line of cross-examination would not negate all of the other evidence. Accordingly, the second assignment of error is overruled.

*Sixth Assignment of Error*

{¶65} In his sixth assignment of error, Johnson asserts that he was denied his right to the effective assistance of counsel. More particularly, Johnson maintains that counsel was ineffective as a result of an accumulation of errors: (1) failing to object to Hollar's testimony that Johnson had previously sold him drugs; (2) failing to object to a number of leading questions asked of Hollar and Det. Ward during their re-direct examinations; (3) eliciting testimony from Det. Ward that counsel previously sought to suppress regarding Johnson's willingness to plead to a fourth degree felony; (4) failing to object to the playing of State's Exhibit 9, a short video clip from the recording of the parking lot, when its

contents were not the subject of cross-examination; (5) failing to object to Det. Ice being re-called by the State to testify; (6) failing to challenge the State's evidence regarding the testing and weighing of the marijuana; and (7) arguing to the jury that Johnson did not *sell* the marijuana but that he was there to *purchase* it.

{¶66} Initially we note that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, 538 N.E.2d 373. In reviewing such a claim, courts are to afford a high level of deference to the performance of trial counsel. *Id.* at 142, 538 N.E.2d 373. The defendant must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland v. Washington* (1984), 466 U.S. 668, 687; see, also, *State v. Sallie*, 81 Ohio St.3d 673, 675, 1998-Ohio-343, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 1995-Ohio-104, 651 N.E.2d 965.

{¶67} Also, in order to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a

reasonable probability that, but for counsel's errors, the outcome at trial or in his legal proceedings would have been different. *Bradley,* 42 Ohio St. 3d at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the result. *Id.* at 142.

{¶68} As to Johnson's first assertion of ineffective assistance regarding counsel's failure to object to Hollar's testimony that Johnson previously sold drugs to him, a review of the record reveals that this assertion is without merit because counsel did object to this line of questioning three times. As to the second contention of Johnson regarding the failure to object to the leading questions asked during re-direct examination, we agree that a number of leading questions were asked of these witnesses on re-direct and that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony[,]" Evid.R. 611(C). However, these questions were not during their *direct* examination, did not introduce matters not previously testified to by these witnesses through the use of non-leading questions during their direct examination, and were used largely as a way to develop their testimony quickly, summarize their previous testimony, and either confirm or deny it. Further, the evidence was such that there was not a reasonable probability that but for these leading questions being allowed the outcome of the trial would have been different.

**{¶69}** As for the remaining contentions of Johnson, each of these involves matters of trial strategy. For instance, after Det. Ward testified about Johnson's admissions to him, counsel for Johnson questioned Det. Ward about Johnson's desire to limit his exposure to prison through a possible plea bargain regardless of whether the charges against him were accurate in order to avoid running the risk associated with a jury trial. This served as an attempt to explain why Johnson may have made the statements that he did to Det. Ward and that he did so even though the charges may not have been accurate. Further, the stipulation about the marijuana allowed the defense to portray an air of candor before the jury, prevented additional prosecution witnesses from having to testify in court, and there was no indication that anything improper occurred in the testing and weighing of the marijuana. See *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 347. Thus, while these strategies may not have ultimately been successful, they did not fall below objective standards of reasonable representation.

**{¶70}** Moreover, none of these perceived errors or the accumulation thereof would have resulted in a different outcome if they had not occurred. Once again, the evidence against Johnson was overwhelming. Thus, we cannot conclude that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different, and the sixth assignment of error is overruled.

**{¶71}** For these reasons, the judgment of the Common Pleas Court of Marion County, Ohio, is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, JJ., concur.**

**/jlr**