[Cite as *State v. Kohlhoffer*, 2025-Ohio-5021.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

Appellee

v.

Brent Kohlhoffer

Appellant

Court of Appeals No. L-24-1165

Trial Court No. CR0202301006

**<u>DECISION AND JUDGMENT</u>**

Decided: November 4, 2025

* * * * *

Brandon J. Henderson, Esq., and Justin M. Weatherly, Esq., for appellant.

Julia R. Bates, Esq., Lucas County Prosecutor and
Evy M. Jarrett, Esq., Assistant Lucas County Prosecutor, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Brent Kohlhofer,[1] appeals the June 3, 2024 judgment of the Lucas

County Court of Common Pleas sentencing him to an aggregate term of life in prison for

---

[1] Kohlhofer's name is misspelled as "Kohlhoffer" throughout much of the record.

his convictions of aggravated murder, murder, and kidnapping. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} Kohlhofer was indicted on two counts each of aggravated murder in violation of R.C. 2903.01(B), unclassified felonies (counts 1 and 2); murder in violation of R.C. 2903.02(B), unclassified felonies (counts 3 and 4); and kidnapping in violation of R.C. 2905.01(A)(3), first-degree felonies (counts 5 and 6). The charges arose from the disappearance and murder of two teenaged boys, 15-year-old K.P. and 16-year-old K.W.

### A. State's case

{¶ 3} Kohlhofer's case was tried to a jury. The state presented the testimony of 31 witnesses. The following evidence was adduced at trial.

#### 1. Family testimony

{¶ 4} K.R., K.P.'s mother, testified that she and K.P. were "[r]eal close" to each other before he died and talked every day. K.R. last saw K.P. on her security camera the morning of Friday, December 2, 2022, and last spoke to him the morning of Saturday, December 3. K.P. called her Saturday night to ask for a ride, but she missed the call, and he did not answer when she tried to call him back. Although it was not unusual for K.R. not to see K.P. during the weekend, she became concerned when she could not contact him. When he did not come home on Monday, December 5, K.R. made a Facebook post asking if anyone had seen him, went looking for him, and ultimately reported to the police that he was missing. She eventually learned from the police that K.P. and K.W.

2.

might have been at an address on Maumee Avenue; when she went to that house, the boys were not there. Eventually, the police recovered two bodies from a property on Chase Street. K.R. identified one of them as K.P.

{¶ 5} A month or two before K.P.'s murder, K.P. called K.R. to tell her that they needed to move out of their house. M.N. and M.B.'s uncle—Kohlhofer—had threatened to burn down their house because Kohlhofer "was blaming [K.P.] for breaking into his house." K.R. did not report this threat to the police. After K.P.'s death, K.R.'s house burned down. She was unsure of the cause.

{¶ 6} On cross-examination, K.R. said that K.P. and Kohlhofer had a good relationship and that Kohlhofer fed K.P., took him on trips and outings, and hired him to do odd jobs.

{¶ 7} Sometime after K.P.'s body was found, K.R. learned that Cruz Garcia was looking for K.P.'s half-brother (who was not K.R.'s son) and had shot up someone's house.

{¶ 8} K.R. was unaware of K.P. using or handling firearms.

{¶ 9} C.W., K.W.'s father, testified that he last saw K.W. alive on December 3, 2022. K.W. and K.P. were going to a slumber party at Maumee Bay that night. It was not unusual for C.W. not to talk to K.W. for days, but not seeing his son for more than a couple of days was not normal. By December 4 or 5, C.W. became concerned about K.W. because no one had spoken to him, and he usually spoke to his siblings daily. C.W.

3.

called 911 to report K.W. missing on December 5. The police found K.W.'s body at a home on Chase Street. C.W. did not know whether K.W. had ever met Kohlhofer.

{¶ 10} A.E., K.W.'s ex-girlfriend, testified that she and K.W. were not together but were "still talking" when he went missing. K.W. was staying at A.E.'s house at the time. She learned that he was missing on December 5, 2022, and last saw him about a week before that. They were arguing that day, and A.E.'s mother dropped him off at A.E.'s uncle Corbin Gingrich's house on Maumee Avenue, where K.W. was going to do some work for Gingrich.

{¶ 11} On December 5, K.W.'s sister called A.E. to ask if she had seen him. She also sent A.E. "screen shots of [her] cousin [B.W.] getting [K.W.] the Uber to [her] Uncle Corey's house." In the screenshots that A.E. saw, B.W. sent K.W. pictures of the Uber app on someone else's phone (i.e., the Uber pictures were not screenshots of B.W.'s phone). There are several messages in the chain that B.W. unsent. A.E. also saw a message that said K.W. was "[b]ack at [A.E.'s] ppls house wit [K.P.]" She interpreted the message as K.W. telling someone that he was at her uncle Corbin's house with K.P. After seeing the messages, A.E. called B.W. to find out what the messages were about because B.W. and Gingrich both told her that they had not seen K.W. She believed that B.W. and Gingrich lied to her when she called them about K.W. because "their stories didn't add up, and they told me that [the boys] weren't over there at all . . . ." Because of that, A.E. did not speak to B.W. or Gingrich again.

4.

{¶ 12} On cross, A.E. said that she was at Gingrich's house on December 3 for a party. She left around 5:00 or 6:00 p.m.

{¶ 13} Although Gingrich did "not really" lie a lot, A.E. did not believe him because he and B.W. kept changing their stories regarding K.W. A.E. had heard that K.W. left Gingrich's house at a weird hour in the night the Thursday before he disappeared, and that Gingrich's gun was stolen. In her police interview, A.E. said that she recognized Gingrich's phone in the photos that B.W. sent to K.W., which she found odd because Gingrich said that he was not at his house at the time and "adults don't leave their phone at home." She believed that Gingrich had something to do with K.W. and K.P.'s disappearance.

### 2. Break-in testimony

{¶ 14} M.N. is Kohlhofer's nephew and was K.P. and K.W.'s friend. He testified that Kohlhofer owned three homes on Chase Street. Kohlhofer's mother lived in one house, Kohlhofer stayed at one house occasionally, and Kohlhofer's codefendant and half-brother, Charles Walker, lived in the third house. In November 2022, two of Kohlhofer's houses on Chase Street were broken into, and the burglars stole marijuana. Although he and Kohlhofer had a good relationship for most of M.N.'s life, the relationship became "[t]errible" in November 2022 after the break-ins because Kohlhofer threatened M.N. Kohlhofer "said if his property doesn't get returned to his house by 12:00 then [K.P.'s] house would be burned down" because Kohlhofer thought that K.P. was involved in the burglaries. M.N. and K.P. were on Chase Street "all the time" before

5.

the burglaries but did not spend time on Chase Street after the burglaries. Kohlhofer and K.P. had a "neutral" relationship before the break-ins, and no relationship afterward.

{¶ 15} On cross, M.N. confirmed that the relationship with his uncle soured because of the break-ins on Chase Street. He clarified that Kohlhofer sent him the message about burning down K.P.'s house the morning after the break-ins, and in response, M.N. made it very clear to Kohlhofer that K.P. did not have anything to do with the burglaries. However, Kohlhofer "didn't want to hear it." He also confirmed that Kohlhofer's threat was to K.P.'s property, not K.P. himself, and K.P.'s house burned down because of an electrical fire at a time when Kohlhofer was not around and could not have caused the fire.

{¶ 16} M.N. was not aware that a window was broken at one of Kohlhofer's homes, but no one went inside. However, he agreed that no one could have taken anything from that house if they were not inside. M.N. confirmed that he told Kohlhofer that K.P. "didn't have nothing to do with" the break-ins, but Kohlhofer "brushed it off. He still was in the mindset that [K.P.] had something to do with it."

{¶ 17} M.B. is another of Kohlhofer's nephews and was K.P. and K.W.'s friend. He testified that he learned that K.P. and K.W. were missing through K.R., who could not contact K.P. To help with the search, M.B. tried contacting K.P.'s and K.W.'s phones and logged into their Facebook Messenger accounts to see who they had last contacted. He was not able to contact K.P. or K.W.

6.

{¶ 18} Regarding Kohlhofer, M.B. testified that he and Kohlhofer had a close relationship, but it soured after M.B. became suspicious that Kohlhofer was involved in this case.

{¶ 19} Kohlhofer owned several houses in the Toledo area, including one in Point Place and three on Chase Street. M.B. recalled that two of Kohlhofer's houses, the house on Patriot and one of the houses on Chase Street, were broken into. He did not know if any property was taken from the houses. The day after the break-ins, K.P. called Kohlhofer to tell Kohlhofer that he did not have anything to do with the burglaries. Kohlhofer responded that "he didn't care. If we didn't do it—if we didn't do it he knew we knew the people that had did it." Kohlhofer took M.B.'s clothing and possessions from M.B.'s house because he "said that [M.B.] knew who did it so he took that in retaliation."

{¶ 20} On cross, M.B. confirmed that Kohlhofer lived at the house on Patriot and did not stay at the Chase Street house often. Kohlhofer had a pretty good relationship with K.P. and never met K.W. When M.B. accessed K.W.'s Facebook Messenger account, he saw that B.W. had deleted some messages in a thread with K.W.

{¶ 21} Tom Fall, an officer with the Washington Township Police Department, testified that he responded to a burglary alarm call at a house on Patriot Drive just before midnight on November 17, 2022. At the house, he saw that the garage door was "a little open" and a "back window was broken out in the bottom portion . . . ." When Fall and his partner knocked on the door, an 11-year-old child who was home alone answered.

7.

The officers checked the property for safety. They did not find an intruder but did find a handgun and a large amount of marijuana. They also noticed that the back door had two large pieces of wood placed horizontally across it, like a barricade.

{¶ 22} While the officers were at the house, three adults, including the homeowner, arrived. Fall also spoke on the phone to a man named Brent, who told Fall that he was the homeowner and said that the officers were not needed at the house. Regardless, Fall insisted on checking the property for safety reasons.

{¶ 23} On cross-examination, Fall confirmed that a rear window was broken, and the alarm had gone off, but he did not find any signs of entry or disturbance inside the house. He believed that the child in the house reported the alarm and confirmed that there were no security cameras on the property.

### 3. Events of December 3, 2022

{¶ 24} P.L. testified that she threw a birthday party for her daughter in a cabin at Maumee Bay State Park on December 3, 2022. K.P. and K.W. attended the party. During the party, one of the other children in attendance told P.L. that they "think one of the kids have a gun." P.L. responded, "whoever have a gun in here needs to leave, and the two boys came down, and they just stepped outside." She said to them, "I don't know if you guys have a gun, or you are playing around, whatever the case may be, but ya'll have to go." The boys were not upset about having to leave. P.L. took them to the front desk and then went back to the cabin to check on the other kids at the party. She returned

8.

to check on the boys a couple of times, and by her third check, the boys were gone.  P.L. assumed that they left in an Uber.

{¶ 25} Video from the Maumee Bay hotel's surveillance system shows two boys, whom Toledo Police Department detectives later identified as K.P. and K.W., waiting in the hotel lobby and then getting into an SUV around 8:14 p.m.

{¶ 26} The Uber driver who drove K.P. and K.W. on December 3 testified that she picked up two masked teenage boys from Maumee Bay around 7:45 p.m. and dropped them off on Maumee Avenue in Toledo around 8:00 p.m.  Someone other than K.P. and K.W. requested the ride; when the driver called that person, he said that his name was John.

{¶ 27} A.N., K.W.'s cousin, testified that he spoke to K.W. around 9:00 p.m. on December 3, 2022.  K.W. told A.N. that he was at his girlfriend's "people's house," which A.N. knew was on Maumee Avenue.  A.N. told K.W. to leave the house.  He and K.W. had an 11-minute video chat, which was the last time A.N. spoke to K.W.  He tried to call K.W. back about 15 minutes after their chat, but K.W. did not answer.

{¶ 28} On cross, A.N. explained that he told K.W. to leave the house on Maumee Avenue for "his safety" because K.W. had taken "Corbin's" gun, and A.N. knew of Corbin's reputation.  K.W. hung up on A.N. during their chat.  When A.N. called back six minutes later, K.W. did not answer.  Nor did he answer when A.N. called back a second time.

9.

{¶ 29} P.Y., who is autistic and was 17 years old in December 2022, testified that he is Carrissa Eames and Don Eames's younger brother and was charged as a codefendant in this case. Originally, he was charged with murder and kidnapping, but he pleaded guilty to obstruction of justice, which he described as "[n]ot being truthful." He admitted to not being truthful during the investigation but claimed that he was being truthful at trial.

{¶ 30} On December 3, P.Y. was at Carrissa and Gingrich's house on Maumee Avenue for a party. After the party, he was in the basement playing video games with B.W., Gingrich's nephew. He wore a headset, which made it difficult for him to hear what was going on upstairs.

{¶ 31} At some point, K.W. and K.P. came to the house. After they arrived, P.Y. and the others smoked marijuana in the basement. Eventually, Gingrich, Gabriel Garcia, and Don came down to the basement, and Gingrich "[c]onfronted [K.W.] about the gun." After the confrontation started, P.Y. went and stood halfway up the basement stairs. From there, he could hear "some tussling and confrontation about a gun that has been missing." He also saw K.P. with a gun, Gingrich with a gun, and Don tying K.W. and K.P. up with HDMI cables. Additionally, he heard Gingrich call Cruz Garcia to tell him that K.W. and K.P. were there and Gingrich was confronting them about the missing gun.

{¶ 32} Later, Cruz Garcia came to the house. P.Y. could not remember if Garcia got to the house before or after Don tied up the boys. P.Y. stayed on the stairs "[f]or a second" before going upstairs to the dining room. Carrissa was there with him, and he

10.

could hear "confronting" happening in the basement. After a while, K.P., K.W., Garcia, Gingrich, Gabriel, and Don came up the stairs. K.W. had a bag on his head and was bleeding when he came upstairs. P.Y. could not remember if K.P. was bleeding. K.P. was tied up when he came up the stairs. P.Y. could not remember if K.W. was tied up. As they walked upstairs, Garcia was behind them, "had them by the neck, like by the back of their shirt[,]" and walked them out the back door and through the gate into the alley. P.Y. could not see anyone in the alley because it was dark, and he was unsure if anyone was out there.

{¶ 33} Once Garcia left with the boys, P.Y. went to the basement to pack up his videogame because Carrissa told him that they were leaving. They went to P.Y.'s parents' house. P.Y. saw Gingrich at his parents' later that evening.

{¶ 34} On cross, P.Y. confirmed that Gingrich believed K.W. had stolen a weapon and used B.W. (his nephew who was around 13 at the time) to lure K.W. and K.P. to the house. During and after the party at Gingrich and Carrissa's house, Gingrich, Don, and Gabriel were drinking and smoking marijuana, and Carrissa, K.W., and P.Y. were smoking marijuana.

{¶ 35} When Gingrich got to the basement, he pulled out a gun. K.P. saw the gun and went to pull out his own gun, but Gingrich and Don got the gun away from K.P. P.Y. testified that things got worse when Garcia arrived. Garcia thought that K.P. and K.W. had broken into his mother's house and pointed a gun at her, which explained his level of aggression. Although P.Y. was not sure if Gingrich pistol whipped the boys, he knew

11.

that Garcia had. While P.Y. was upstairs, he could hear the boys screaming and pleading and Garcia yelling. Don got scared when he learned that Garcia was coming to the house because he was afraid that Garcia was going to cause him physical harm.

{¶ 36} Gingrich wanted P.Y. to drive to Maumee Bay to pick up the boys, but he refused because he did not want to be involved. Carrissa told P.Y. not to tell anyone what happened at the house, so he "kept [his] mouth shut." Don also went with P.Y. and Carrissa to P.Y.'s house, and during the drive, Carrissa stopped the car and told Don to get rid of the gun that the men had taken from K.P. P.Y. recalled telling the police that he was scared of Garcia and the "other guys."

{¶ 37} P.Y. did not recall telling his neighbor that he was in the basement when the boys were beaten, that he knew the boys were going to be killed, or that the boys had died in the basement.

{¶ 38} On redirect, P.Y. clarified that the "other guys" he told the police about were men that he did not know. He also agreed that he had told the police that he saw people in all black in the alley, but their faces were blocked by the gate. P.Y. did not know who killed the boys or where they were killed.

{¶ 39} Corbin Gingrich, another one of Kohlhofer's codefendants, testified that he was initially arrested and charged with obstruction of justice for lying about not seeing K.P. and K.W. on the night of December 3, and for drug and weapons charges. He claimed that he lied because he "was scared of prosecution and scared of the situation [he] was in." Later, he was charged with aggravated murder, murder, and kidnapping,

12.

but he received a plea deal for testifying. He pleaded guilty to two counts of involuntary manslaughter and two counts of kidnapping, with a total available sentencing range of community control to 49 years in prison. As part of the plea agreement, the state agreed to dismiss the obstruction, weapons, and drug charges. His plea agreement was contingent upon him testifying completely and truthfully at any codefendants' trials, including Kohlhofer's.

{¶ 40} Gingrich admitted that he lied to the police multiple times. He claimed that he did so because he was scared of prosecution and scared for his life. He also deleted things off of his phone, lied to the police about the extent of his participation in events and what events happened at his house, lied about who was at his house, and destroyed one of his two phones, which he had used to order the Uber and call Garcia. Despite all of this, he thought the jury should believe his testimony because "I made very bad choices, but I have to take steps to try to make things right, and this is the first step that I need to take to make things right, telling the truth." He claimed that he lied in his first statement to the police while he was in custody, despite claiming that he felt safer being incarcerated, because he "didn't know if it would still be possible somebody could get to [him] from [him] telling the truth."

{¶ 41} In December 2022, Gingrich and Garcia were friends, and Gingrich would have lied for Garcia. He no longer felt that way, however, because "lying for him is who got me in the situation I'm in today."

{¶ 42} On December 3, 2022, Gingrich lived at 507 Maumee Avenue with Carrissa and their three children. They hosted a party that day, and around 7:00 p.m., he noticed that his gun was missing. He kept it on top of a kitchen cabinet by the back door, and when he went to grab it to take it outside with him, it was not there. He first thought that he had misplaced it, or that Carrissa had moved it. When Carrissa denied moving the gun, Gingrich immediately suspected that either Don, Carrissa's brother, or K.W., who was dating his niece, A.E., had stolen it. Gingrich suspected Don because "he had stolen stuff in the past." He eventually confronted Don about the missing gun but did not recover it. Gingrich had known K.W. for about a year at the time of the party and treated him like a nephew. He suspected K.W. because a week earlier, K.W. "had left [Gingrich's] house at 4 or 5 in the morning out of nowhere."

{¶ 43} After discussing the gun with Carrissa, Gingrich asked B.W. about the gun, but he did not know anything about its disappearance. Gingrich then had B.W. message K.W. on Facebook to "see if he acts funny." Twenty or 30 minutes later, B.W. told Gingrich that K.W. was being kicked out of a party and was stranded and asked if Gingrich could get him an Uber. Gingrich agreed to do so "to have him come over and ask him and confront him about the gun." Gingrich admitted to trying to delete the emails related to the Uber ride so "there was no record of [him] getting an Uber."

{¶ 44} K.W. got to Gingrich's house around 8:30 or 9:00 p.m. He was with K.P., whom Gingrich did not know. About 20 or 30 minutes after the boys arrived, Don came upstairs from the basement to tell Gingrich that one of the boys was on a video call

14.

showing off a gun. Gingrich went to the basement and "confronted" K.W. about the gun. Specifically, Gingrich described a conversation in which he raised his voice and asked K.W. if he stole the gun, which K.W. denied. While the conversation was going on, Gingrich noticed K.P. reaching for a gun. As K.P. pulled the gun, Gingrich "tackled him and started wrestling with him with the firearm." While they were wrestling on the floor, Don came over and hit K.P. in the head with a gun (that was not Gingrich's stolen gun). K.P. dropped his gun, and Don picked it up. Don then handed his gun to Gingrich, who gave it to P.Y. to take upstairs.

{¶ 45} Next, Gingrich continued the "conversation" about his missing gun. During this talk, Don suggested tying up K.P. and K.W. Gingrich did not have any rope, so he suggested using HDMI cables from the videogame systems. Don used the cords to tie the boys' hands behind their backs. Gingrich claimed that they did so because they were "trying to control the situation and calm the situation." He could not explain why he did not stop Don from tying up the boys.

{¶ 46} After the boys were restrained, Gingrich continued questioning K.W. about the missing gun, and K.W. continued denying that he stole it. Eventually, K.W. told Gingrich to call Garcia "to ask him if [K.W.] ever stole anything from him." Gingrich refused because Garcia suspected K.W. of breaking into his mother's house five or six months earlier. K.P. then told him to call Garcia because Garcia knew his dad and would "get everything figured out on his end." Gingrich relented because he did not know K.P.

15.

or his family and "didn't want to start a potential beef between [him] and Cruz about this kid being in [his] basement tied up."

{¶ 47} After unsuccessfully trying to reach Garcia two or three times, Gingrich asked Carrissa to call Diamond Rivera, Garcia's fiancée. Rivera passed the message to Garcia, who contacted Gingrich by video call.

{¶ 48} Gingrich told Garcia that he had caught K.W. stealing and asked if Garcia knew K.P. When he confirmed that he did, Gingrich told him to "get ahold of [K.P.'s] people to figure out what is going on" because K.P. pulled a gun on Gingrich in Gingrich's house. Garcia disconnected the call but called back a couple of minutes later to tell Gingrich that he was coming over.

{¶ 49} Garcia arrived at Gingrich's house about 30 minutes later. When he got to the house, he went to the basement and "started pistol whipping [K.P.]" while saying, "I know that was you that broke into my mom's house. Cuz this is what happens when you steal." K.P. denied being involved in the attempted break-in and named other people who were involved, including his brother. Garcia moved on to hitting K.W. with the gun. When he went to hit K.P. again, Gingrich stopped him because he was "doing too much." After being struck with the guns, K.W. was bleeding a little bit along his hairline. Garcia told him to use a garbage bag like a rag to prevent the blood from getting anywhere.

{¶ 50} Next, Gingrich asked if "his" people were coming, and Garcia said that his ride was on the way. Garcia then continued to talk to the boys about who broke into his mother's house. During that conversation, K.P. asked if they could untie him. Garcia

16.

responded, "you gonna take that up with Beezy." Gingrich had met Beezy once but did not know his real name. K.P. commented, "I don't know what he wants with me. He knows I didn't have nothing to do with that shit."

{¶ 51} Shortly after this, Garcia received a phone call from someone telling him that they had arrived at the house. The person called back once they were parked in the alley behind the house. At this point, the boys got up from the basement floor. K.W.'s hands were loosely tied, and Gingrich pulled the HDMI cord off of them. Then he, Garcia, and Gabriel walked the boys outside to a black Chevy Impala that was waiting in the alley. There were two men standing by the back end of the car. Gingrich recognized one as Beezy and identified the men in court as Kohlhofer and Walker.

{¶ 52} Garcia had been walking with K.P., who he pushed toward Kohlhofer. Kohlhofer "struck" K.P., who fell to the ground. Then Walker grabbed K.W. and punched him. After that, Gingrich heard Kohlhofer say to K.P., "nephew, what did I tell you about stealing[,]" and Walker began taping K.W.'s wrists. Then Gingrich and Gabriel walked back to the house.

{¶ 53} Once Gingrich was back in the house, either P.Y. or B.W. asked for the HDMI cord, so Gingrich called Garcia and asked him to bring the cord back when he was finished. About 10 minutes later, Garcia called back to say that he put the cord on a white car that was parked in the back yard.

{¶ 54} According to Gingrich, he "had a really bad vibe about the situation," and P.Y. was very shaken up, so he and Carrissa decided to go to Carrissa's mother's house.

17.

{¶ 55} Later that night, Garcia called Gingrich to tell him that he had gotten home. On December 5 or 6, Carrissa learned that K.W. had unfriended her on Facebook, so Gingrich called Garcia to make sure everything was all right and he did not have to worry about the boys coming back to mess up his house. Garcia said, "everything was cool. But I'm going to call just to verify and make sure everything is cool." He called back later to confirm that "everything is cool. You don't got to worry about it." The next day, Gingrich began seeing the missing person posts, so he called Garcia again. In that conversation, according to Gingrich, Garcia first tried to

> down play the situation like everything is cool. You ain't got to worry about that. But I kind of was yelling at him, because people are starting to share my picture saying that I had something to do with their disappearance, and I'm the last person they've been with, and people are starting to come to my house."
>
> . . .
>
> At that point then he had told me that, I ain't going to lie. Beezy did some bullshit, and that I needed to clean up over there and make sure there is no blood on the floor. If there is I need to go and get deer blood and dump the deer blood around my basement.
> . . .
>
> I stressed to him that I did not sign up for this. Do you not understand what we just got ourselves into? . . .

{¶ 56} Garcia told Gingrich to tell the police that he did not know anything if they came, to be safe, and to keep his head on a swivel.

{¶ 57} During this time, Gingrich was getting threats, and Garcia's house "got shot up," so Gingrich and Carrissa decided to leave their home to live in vacation rentals.

18.

{¶ 58} The next time Gingrich had contact with Garcia was when Gingrich asked Garcia for some marijuana. As Gingrich was getting ready to go to Garcia's house, Garcia called Gingrich and said "to hold on, some weird shit is going on. I will call you when it's cool to come through." Garcia called back around 10:00 or 11:00 that night, but Gingrich did not go to Garcia's house because "[t]he situation felt fishy to [him]."

{¶ 59} The final time Gingrich had contact with Garcia before his arrest was when Garcia texted him around 2:00 a.m. asking if he was up and wanted to smoke. Gingrich did not respond to the message because "that situation felt fishy to [him]."

{¶ 60} Gingrich did not follow Garcia's deer blood advice because there was no blood on his basement floor.

{¶ 61} Gingrich claimed that he did not murder K.P. or K.W. He last saw the boys in the alley behind his house, at which point they were alive and with him, Garcia, Gabriel, Kohlhofer, and Walker. He believed that they left with Kohlhofer and Walker.

{¶ 62} On cross-examination, Gingrich denied trying to lure K.W. to his house on December 3; he only wanted B.W. to message K.W. to see if he "acted weird."

{¶ 63} In his first interview with police, about a week after the boys disappeared, Gingrich denied seeing the boys on December 3. Four days later, in his second interview with police, Gingrich admitted that the boys had been at his house but denied having anything to do with their disappearance. He claimed that they left the house with Garcia, and he did not mention Kohlhofer's or Walker's name at all. In fact, he "never brought

19.

up Brent Kohlhoffer [sic] . . ." in his interviews with the police, but the detectives brought up that name. However, he thought that he mentioned the name "Beezy" first.

{¶ 64} Gingrich originally told police that there were two Black men wearing masks in the alley as a way to protect Carrissa because she would not be able to tell police who it was if he did not tell her who it really was. In his third interview with the police, Gingrich switched from saying it was two Black men in the alley to two white men who were wearing masks, and he recognized Beezy's voice.

{¶ 65} After the fact, Gingrich, Carrissa, Crystal LaForge Yingling, Carrissa and P.Y.'s mother, Don, P.Y., and B.W. collaborated about the story they planned to tell the police. Gingrich told the police that Crystal did not know too much about the situation, just that Garcia took the boys.

{¶ 66} Regarding the early morning message from Garcia asking if he was up and wanted to smoke marijuana, Gingrich thought that the message was strange, and that Garcia was acting strange.

{¶ 67} He did not know what happened to the boys' phones but thought that Don might have had them.

{¶ 68} Gingrich knew that Carrissa had cleaned blood off of Garcia's gun.

{¶ 69} He believed that the boys left with Kohlhofer and Walker because that's what Garcia told him.

{¶ 70} Garcia, one of Kohlhofer's codefendants, testified that he received a plea deal for testifying. He was charged with aggravated murder, murder, and kidnapping, but

20.

pleaded guilty to two counts of involuntary manslaughter and two counts of kidnapping, with a total available sentencing range of six to 48 years in prison. His plea agreement was contingent upon him testifying completely and truthfully at any codefendants' trials, including Kohlhofer's.

{¶ 71} Before getting into the substance of his testimony, Garcia admitted that he spoke with and lied to the police twice before K.P. and K.W. were found and he was arrested because he was afraid of being charged and of something happening to him. He also lied to the police when they interviewed him after he was arrested and charged in this case. The fourth time he spoke with the police, he finally told them the truth about the events that led to K.P.'s and K.W.'s deaths. He claimed that he did so because he "would like the truth to be known because the families deserve to know what happened that night."

{¶ 72} The night that K.P. and K.W. disappeared, Garcia had gone out to dinner for a friend's birthday. After dinner, he went to buy marijuana in Michigan. When he got to his "weed man's" house, he got a video call from Gingrich, who showed him K.P. and K.W. tied up with their hands behind their backs in Gingrich's basement. He had tied them up because he caught them stealing a gun from his house. Garcia recognized K.W. as one of the people who tried to break into his mother's house. He also knew that Kohlhofer and Walker were looking for K.P. because they thought that K.P. and M.N. had broken into their homes on Chase Street in November and stolen marijuana, money, and guns, so he called Kohlhofer. Kohlhofer "tells [him] to get over there ASAP. Make

21.

sure they don't let them leave." As a result, Garcia left Michigan, went to his house on Seaman Road in Oregon to get his gun, and then went to Gingrich's house on Maumee Avenue.

{¶ 73} When Garcia got to Gingrich's house, he called Kohlhofer again to let Kohlhofer know that he had arrived and to give Kohlhofer the address. As he was waiting for Kohlhofer to get there, Gingrich took him to the basement. Gingrich and B.W. were in the basement with Garcia, and Don, Carrissa, and Gabe Garcia were elsewhere in the house. Garcia "confronted" K.W. and K.P. about trying to break into his mother's house. When they denied doing so, Garcia hit them in their heads with the handle of his gun. As he went to hit them a second time, K.P. claimed that his brother was the person who tried to break into Garcia's mother's house and asked Garcia to let them go. Garcia responded that "they have to take that up with Beezy when he gets here." Beezy is Kohlhofer's nickname. At 9:50 p.m., Kohlhofer texted Garcia, "I'm a send bro just tell me where[,]" which Garcia interpreted as Kohlhofer saying that he was going to send Walker. While waiting for Kohlhofer to arrive, Garcia pointed his gun at the boys so that they would not run away.

{¶ 74} Next, Kohlhofer called to tell Garcia that he was outside the Maumee Avenue house. Based on Gingrich's instructions, Garcia told him to park in the alley behind the house because there were no cameras back there. He and Gingrich walked the boys, with their arms tied behind their backs, out the back door to the alley to meet Kohlhofer and Walker, who were standing by Walker's black Chevy Impala with the

22.

trunk open. Kohlhofer punched one of the boys, and Walker "smashed" the other with a pistol, causing them to fall, after which both stomped on the boys. After that, Walker used duct tape to tape their mouths and hogtie their hands and legs. At this point, Gingrich began to walk away, and Walker and Kohlhofer put the boys in the trunk of the Impala, which had a blue tarp in it. Kohlhofer told Garcia that he needed to follow them. Before leaving the house, Garcia gave his gun to Carrissa so that she could clean it because he thought that it had the boys' DNA on it.

{¶ 75} Garcia followed the Impala in his truck to Chase Street. While they were driving, Garcia called Kohlhofer, who told him to stay behind the Impala so that it did not get pulled over. During their conversation, Kohlhofer asked him how K.P. ended up at Gingrich's house and who knew that Kohlhofer was coming to get the boys. Garcia told him that "everybody" knew he was coming over because Garcia had told the boys that "they had to take it up with Beezy when he gets here." Kohlhofer was concerned that Walker would have to "go back through there" because people knew he was there, but Garcia assured him that Gingrich was "going to keep everyone quiet."

{¶ 76} Once they were on Chase Street and had passed Kohlhofer's house, Garcia called him again to ask where they were going. Kohlhofer told Garcia to go home and said "[h]e got it handled." According to a text conversation with someone Garcia was buying shoes from, he was back at his house sometime after 11:17 p.m.

{¶ 77} After he got home, Garcia got another video call from Gingrich. Gingrich was worried because the boys had unfriended him on Facebook and he thought they

23.

might return to his house to retaliate. When Garcia called Kohlhofer to find out about the situation, Kohlhofer said, "tell Corbin not to worry about it. They are not going to do nothing. I already told you I will handle it. Tell him to worry about cleaning up over there."

{¶ 78} Sometime after noon on December 4, Garcia went to Kohlhofer's "to ask more about the night before." He asked if Kohlhofer and Walker had shot the boys because he had heard gunshots when he was driving home, which Kohlhofer denied. However, "Chuck said that he should have. The little n***** were tough. We can't believe they didn't tell us where the shit was. They really fought to the end and took that to the grave. . . . Brent interrupted and said, you guys need to shut the fuck up and act like none of this ever happened."

{¶ 79} Later that night, Kohlhofer and Walker arrived at Garcia's house to talk about their alibi. They wanted to go to Gingrich's to make sure that they had not left anything in the alley and that Gingrich would not say anything about the night before. Garcia assured them that Gingrich would keep quiet.

{¶ 80} The next day, Walker came back to Garcia's house to see if he had said anything about the other night because people were accusing Garcia of having the boys in his basement. When Walker left, Garcia called Kohlhofer, who assured him that he did not need to worry as long as he kept quiet. Soon after, Garcia learned from a friend that K.W.'s uncle wanted Garcia to let K.W. go. Garcia called Kohlhofer, who said he would "try to clear [Garcia's] name." Kohlhofer eventually told Garcia that he thought that

24.

Garcia was in the clear, and if he had known that one of the boys was related to the uncle, "he probably would have gotten his stuff back. It's too late." Kohlhofer offered to have Walker install security cameras at Garcia's house. While Walker was installing the cameras, a detective came to the house to speak with Garcia. After the detective left, Garcia called Kohlhofer to ask what to do. Kohlhofer told him, "you need to clean up over there" and "if [the police] had something on you they would have came and got you by now." Garcia "asked him maybe they could let them go. This shit is getting way out of hand, and that's when [Kohlhofer] said let them go? Them n***** been dead."

{¶ 81} The next day, Walker picked Garcia up from outside of an attorney's office to ask if the detectives had said anything about him or Kohlhofer. Garcia said they only asked about Gingrich.

{¶ 82} To attempt to hide his involvement in this situation, Garcia deleted text messages, phone calls, and posts from his phone. One Facebook post in particular said, "We don't fw lames bums or theifs u N****s finished ✅ [sic]." Garcia claimed that the post was directed at Don and related to a "prior beef" between the two men because Don owed him money for marijuana. He said that he deleted the post after a friend told him to because it sounded incriminating.

{¶ 83} Regarding the gun that he had on December 3, Garcia said that he eventually got it back from Carrissa, but after he got it home, he wrapped it in a plastic grocery bag and threw it in his garbage can.

25.

{¶ 84} Garcia denied murdering K.P. and K.W. The boys were both alive and getting into the trunk of Walker's Impala when he last saw them. He did not see the boys after that.

{¶ 85} On cross-examination, Garcia admitted that he lied to the police about many things in his first interview, including saying that he suspected both boys of trying to rob his mother's house, and that he did not have a gun on him the night of December 3. In his most recent interview with the police, Garcia told them that the boys had plastic grocery bags on their heads when they came out of the basement, which he had not mentioned in his prior interviews. The bags were on their heads to prevent them from seeing where they were walking and who was around them, not because of blood. He could not remember if the boys were bleeding after he pistol whipped them. He did not know what happened to the cords used to tie up the boys after Walker duct taped their hands and feet. In one of his police interviews, Garcia told the detectives that he did not know why he was following Walker's car that night, but in court, he said it was to prevent Walker from getting pulled over. Garcia denied changing his story in response to discovery but claimed that he just added more to it each time he spoke with the police.

{¶ 86} Garcia went to Gingrich's house on December 3 to get the truth out of the boys about who tried to rob his mother's house. Seeing K.W. wearing the same shoes as one of the people in the video footage he had of the would-be burglars confirmed for Garcia that K.W. was involved. He only pistol whipped each of the boys once because he "felt like that's all that took, you know, to make them tell [him] they broke into [his]

26.

mom's house." He claimed that K.P. told him that K.P.'s brother was the one who tried to break into his mother's house after Garcia hit him with a gun one time, but Walker later told him that the boys were tough, would not tell them anything, and "took that shit to the grave."

{¶ 87} Garcia made the deleted Facebook post around 10:15 a.m. on December 5, the morning of the fire. He maintained that the post was aimed at Don (a white man), who owed him $150, despite including a racial slur generally directed at Black people, claiming "that's not literally like being a racial slur . . . that's slang for multiple people." He blamed the use of the plural form of the slur on typing the post on his phone.

{¶ 88} Although Garcia and Gingrich were both mad at K.W. that night, they were not mad enough to kill him. He also claimed that he went home to get his gun to protect himself.

{¶ 89} He again denied killing K.W. and K.P.

{¶ 90} Garcia thought that Kohlhofer was looking for K.P. because K.P. and M.N. had broken into Kohlhofer's house on Chase Street, and Kohlhofer had seen them on video breaking into the house. He was not aware that Kohlhofer did not have cameras at the Chase Street house or that nothing was actually stolen from the house. Garcia thought that Kohlhofer was "dumb enough to just do this right in his own backyard and call all this scrutiny and heat onto himself[.]"

{¶ 91} He denied telling Gingrich to use deer blood to cover up any of the boys' blood in the basement.

27.

{¶ 92} Garcia admitted that he had been calling Kohlhofer for marijuana that day and that Kohlhofer's text of "I'm a send bro just tell me where" indicated that Kohlhofer was not going anywhere. Garcia contacted Gingrich about 20 minutes after the fire started to ask him if he was up and wanted to smoke.

### 4. Events of December 5 and 6, 2022

{¶ 93} Lieutenant Philip Cook of the TPD testified that he is responsible for retrieving 911 calls and call records. He presented the records of C.W.'s December 5, 2022, 911 call to report K.W. missing. In the call, C.W. provided K.W.'s demographic information, told the operator what K.W. was wearing when he was last seen, and said that K.W. was last seen on December 3 around 4:00 p.m.

{¶ 94} Cook also presented the records of the six 911 calls that came in about a fire at 3015 Chase Street. The callers reported that someone threw an unknown object that made a loud sound into the back of the house, the house was vacant, there was thick black smoke, the back of the house was engulfed in flames, there were flames on the side of the house, and there was a big bang.

{¶ 95} TPD officer Cole Decant responded to the house fire at 3015 Chase Street just after midnight on December 5, 2022. When he arrived at the scene, he saw flames and smoke coming from the house. While on scene, he attempted to locate witnesses or people involved with the fire. He interviewed neighbors who told him that they saw someone throw something that was on fire into the house and then run away down the

28.

alley. The neighbors were not able to give any more information about the person in the alley.

{¶ 96} Later that day, Decant was working as a desk officer at the safety building when K.R. came in to report K.P. missing. He had been gone for approximately two days. Decant took her report and notified the investigative services bureau and the records department.

{¶ 97} On cross, Decant said that the neighbors could not say which direction the person in the alley went. Decant believed that he asked the neighbors about the person's race and gender, despite those questions not appearing in the body camera video.

{¶ 98} Robert Krause, a fire battalion chief with the Toledo Fire Division, testified that he was one of the firefighters who responded to the house fire at 3015 Chase Street on December 5. When he got to the scene, he assessed the house and determined that the fire was concentrated in the back left corner of the building. As firefighters were putting out the fire, one fell through the stairs, the fire made its way into the walls and the attic, and the crews had to chase the fire, so Krause eventually decided to pull the firefighters out of the building for their safety and have them fight the fire from the outside. Although they were able to get most of the fire out, they could not completely extinguish the fire without demolishing the house.

{¶ 99} D.M. lived near 3015 Chase. He testified that he called 911 on December 5, after seeing a fire burning through the window of an empty house near his home. He did not see who threw something into the house, who started the fire, where the person

29.

went after starting the fire, or the police canvassing the area to see if they could find the person who ran away from the house.

{¶ 100} C.B. lived across the street from 3015 Chase. On December 5, she was checking her security camera before she went to bed when she "seen and heard an explosion, and the house across the street from [her] was engulfed in flames." She called 911 to report the fire. She told the operator that she heard a male voice and a female voice in the back of 3015 Chase, near the alley, but she could not see who was speaking. She did not see anyone throw anything into the house.

{¶ 101} On cross, C.B. confirmed that she heard the voices in the alley, which she mentioned in her 911 call and in an interview with detectives. She described the house across the street as abandoned and poorly maintained, with overgrown grass and no landscaping. She was not looking outside in the hours before the fire, so she did not know if cars came and went at the abandoned house before the fire started.

{¶ 102} Kathryn Brown, a TFD arson investigator, testified about her investigation of the fire at 3015 Chase Street. She arrived on the scene while firefighters were working to extinguish the fire. She was not able to enter the house because it was unsafe. Brown spoke with several witnesses who reported seeing someone throw a Molotov cocktail into the house, but they could not identify the person because the person was wearing dark clothes, it was very early in the morning and dark, and the witnesses were not near the person.

30.

{¶ 103} Brown determined the fire was incendiary, meaning it was intentionally set, because the house was abandoned, there were no utilities at the house, and witnesses saw someone throw something that was burning into the house. She also determined that the fire started in the left rear of the house. Brown returned to the scene the next day to interview witnesses and look for cameras that might have captured footage. She did not find any video cameras.

{¶ 104} TPD officer Antonio Aguilar responded to a check safety call for K.W. at 507 Maumee Avenue on December 6, 2022. Aguilar spoke to Carrissa Eames, the homeowner, who told him that K.W. was her niece's boyfriend and her nephew's friend. She last saw K.W. on November 30 when he stayed the night with them. He left the next morning because "he had to go to some parties." Carrissa also said that K.W. had gone to a party at Maumee Bay but was "kicked out for arguing." Aguilar did not recall Carrissa saying anything about seeing K.W. on December 3.

### 5. Events of December 15, 2022

{¶ 105} Shelbie Flegall, a firefighter, paramedic, and K-9 handler for the Springfield Township Fire Department, testified that she had her K-9 partner, Darwin, a trained cadaver dog, examine the rubble at 3015 Chase Street on December 15, 2022. Darwin alerted to the presence of human remains in an area of the rubble near the back left corner of the house. A second cadaver dog from a different organization independently alerted to the same area.

31.

{¶ 106} Sara Pederson, a special agent with the FBI, testified that she was the team leader of the evidence response team that helped search the rubble of the burned house at 3015 Chase Street. While she was at the house on December 15, 2022, two cadaver dogs searched the pile and indicated that they smelled human remains. At that point, TPD decided to obtain a search warrant for the property.

{¶ 107} Once officers secured the warrant, Pederson's team began excavating the site. Their process involved an excavator scooping debris from the pile, putting the debris in the alley that ran beside the house, team members sifting through the debris in the alley for evidence, and marking, photographing, and collecting any evidence they found. Ultimately, the evidence response team found the boys' naked bodies "basically at the bottom of the pile of debris." They also found and collected a black HDMI cord, another black cord, some tape, and two videogame controllers with attached cords.

{¶ 108} On cross-examination, Pederson said that the tape her team found did not look like duct tape.

{¶ 109} Charles LeRoux, a detective with the TPD crimes against persons bureau, testified that he was asked to assist at 3015 Chase Street while the FBI was sifting through the rubble left after the house fire. While he was there, he spoke to a neighbor on New York Avenue who had security cameras that cover Chase Street. The neighbor gave LeRoux a hard drive with video footage from December 3, 4, and 5, 2022.[2]

---

[2] LeRoux testified that the timestamps on the surveillance video collected from the house on New York Avenue were 9 to 10 minutes ahead of the actual time. For consistency, all

32.

{¶ 110} On cross, LeRoux said that he knocked on the neighbor's door to ask about security footage, but he did not look at other houses or knock on other doors to see if they had video cameras.

### 6. Coroner's testimony

{¶ 111} Dr. Jeffrey Hudson, a Lucas County deputy coroner, performed the autopsies on K.P. and K.W.

{¶ 112} During K.W.'s autopsy, Hudson noted several significant findings, including postmortem thermal burns to much of K.W.'s body; hemorrhages in the superficial and deep strap muscles of the neck and cerebral vascular congestion, which indicated strangulation; and blunt force trauma to the head, evidenced by subgaleal hemorrhage under the left frontotemporal scalp, hemorrhage in the right temporalis muscle, bilateral subarachnoid hemorrhages, and mild cerebral edema. The bleeding on K.W.'s brain was not sufficient to cause death on its own. Hudson opined that K.W. was dead before the fire started, based on negative toxicology results for carbon monoxide and cyanide and the absence of soot and thermal injuries in K.W.'s airways. Hudson determined that K.W.'s cause of death was strangulation, and his manner of death was homicidal violence. He explained that strangulation requires exertion of "a large amount

---

times from that video footage that we include in our decision have been adjusted to the time the events actually occurred by subtracting 10 minutes from the time on the timestamp.

33.

of force" on the front of the neck for "a significant period of time"—as long as "several minutes."

{¶ 113} During K.P.'s autopsy, Hudson noted several significant findings, including postmortem thermal burns to much of K.P.'s body; a broken right ulna and gaping defects in the buttocks, which were postmortem injuries likely caused by the equipment that excavated the body; and blunt force trauma to the head, evidenced by subgaleal hemorrhage under the left frontotemporal and right frontal scalp, two lacerations on the forehead, right facial swelling, and mild cerebral edema. Hudson opined that K.P. was dead before the fire started, based on negative toxicology results for carbon monoxide and cyanide and the absence of soot and thermal injuries in K.P.'s airways.

{¶ 114} Ultimately, Hudson concluded that K.P.'s cause of death was homicide by unspecified means, and his manner of death was "Homicide – UNDETERMINED VIOLENCE" because the autopsy did not reveal a specific cause of death. He explained that he reached this conclusion based on the autopsy results combined with the case history (i.e., "these boys were reported missing ten days before they were found. And then they were found deceased") and the circumstances of his body's discovery (i.e., "[h]e was found in a burned out house next to another young man that was strangled and beaten"). He explained that there are things that cause death but do not leave evidence on the body. He gave the example of "asphyxiation due to suffocation to come from someone that covers the mouth and nose, from a bag over the head, any number of things

34.

. . . ." Hudson did not find any indication that K.P.'s death was natural, accidental, or suicide.

{¶ 115} On cross-examination, defense counsel asked Hudson to explain the injuries to the boys' head in laymen's terms. He said that K.W. suffered blunt force trauma to the left forehead and side of the head; bleeding in the right temporalis muscle, which is the area above the ear; and "patchy" bleeding on the surface of the brain. K.P. suffered mild swelling of the brain. Hudson also confirmed that certain ways of killing someone, such as those from a bag over the head, might not leave evidence on the body. In K.W.'s case, he did not see any evidence of ligature strangulation, e.g., strangulation by rope, twine, or duct tape. Hudson acknowledged that blunt force trauma could be caused by objects like the butt of a gun, and that strangulation is often an up-close, personal act. He reiterated that he could not determine the specific weapon used or the exact circumstances of the boys' deaths.

### 7. Forensic testimony

{¶ 116} Duane Isabell, a detective with the TPD digital forensics department, was one of the detectives who extracted information from the codefendants' cellphones.

{¶ 117} On one of the phones that Isabell extracted—Corey's phone—he noticed that items had been deleted from the phone, including location data and text messages.

{¶ 118} Joseph Fuller, a detective with the TPD digital forensics department, was the other detective who extracted information from the codefendants' cellphones.

35.

{¶ 119} During his testimony, Fuller discussed some text messages extracted from Garcia's phone. The morning of December 3, Garcia texted another person, apparently about buying some shoes. Later in the afternoon, he told the other person that he was going out that evening and would contact the other person later. Around 9:30 p.m., the other person asked if Garcia was home, and Garcia responded that he was on his way. About an hour later, the other person said, "I'm outside"; Garcia did not respond. Around 45 minutes later, the other person again said, "I'm outside." This time, Garcia responded, "Ok[.]"

{¶ 120} At about 9:45 p.m., Garcia received a message from a phone number ending in 9020 that said, "I'm a send bro just tell me where[.]"

{¶ 121} Additionally, Fuller found an image on Garcia's phone that was created the morning of December 5 that says, "We don't fw lames bums or theifs u N****s finished ✅ [.]" According to Fuller, "fw" means "fuck with."

{¶ 122} A November 2022 text from Walker's girlfriend's phone indicated that she was not going to be at work that day because her house had been broken into.

{¶ 123} On cross-examination, Fuller confirmed that he did not know who some of the messages attributed to Garcia's phone were sent to, or what the conversations were about.

{¶ 124} TPD detective William Clark testified that he works in the department's crime scene investigation unit. He was asked to process two vehicles involved in this case, a gray Ford F-150 and a black Chevrolet Impala. Regarding the F-150, he swabbed

36.

the interior of the truck for DNA evidence. Clark found a shotgun shell and a hospital blanket with a stain on it in the rear seat of the F-150.

{¶ 125} Regarding the Impala, Clark processed the car twice. The first time, he swabbed the interior of the car for DNA evidence. He found a blue cooler bag with a "red/brown stain" on it and a receipt for the purchase of a tarp, staples, and bungee cords in the backseat of the Impala. The receipt was from December 13, 2022. Clark believed that the interior of the Impala had recently been cleaned, he could not tell whether the trunk had recently been cleaned, and the exterior had "recent road salt and dust on it." The second time he processed the Impala, Clark removed the trunk lining and swabbed the interior of the trunk.

{¶ 126} On cross, Clark admitted that he did not swab the bed of the F-150 because detective Marchyok told him to focus on the Impala, and the truck had been stored outside and exposed to rain, which would have destroyed anything of evidentiary value.

{¶ 127} Regarding the Impala, Clark removed the fabric covering all of the seats and arm rests but did not do so for the F-150. He admitted that he was primarily focused on the Impala and was very thorough when he processed the trunk. The trunk liner was made of fabric that would absorb fluids. Clark used a chemical to detect blood evidence in the Impala's passenger compartment, but he did not find any. He did not encounter a Chrysler 300 in the course of his work on this case.

37.

{¶ 128} Timothy Augsback, a forensic scientist with the Ohio Bureau of Criminal Investigation, analyzed the DNA results for multiple pieces of evidence in this case, including a piece of glass, two cords, a videogame controller, some tape, a gas can, a lighter, the swabs from the Impala's trunk, the liner from the Impala's trunk, and a note and envelope. Most of the tested items did not have DNA profiles on them or had DNA that was not of sufficient quality for comparison. The two items with DNA sufficient for comparison were the piece of glass and the middle of the videogame controller cord. The glass tested presumptively positive for blood, but Kohlhofer, K.P., and K.W. were all excluded as contributors of the DNA on the glass. K.W. was found to be the major contributor to the mixture of DNA on the middle (but not the end) of the videogame controller cord, with the remaining DNA on the middle of the cord not being of sufficient quality for comparison. There was no blood identified on the liner from the Impala's truck. Augsback confirmed that he could not tell when or how K.W.'s DNA got on the controller cord, and not finding a person's DNA on an object did not mean that the person never touched the object; they could have touched it without leaving DNA.

{¶ 129} On cross, Augsback confirmed that there was no DNA found in the trunk of the black Impala. He could not recall what kind of tape was tested. He also confirmed that only two pieces of evidence had DNA suitable for comparison, and only the videogame controller cord came back with a match to K.W.

{¶ 130} John Orlando is a special agent with the FBI's cellular analysis survey team. He explained that cellphones are always communicating with cell towers while

38.

they are on and not in airplane mode, and cellular providers keep records (call detail records or CDRs) that capture a phone's interaction with the network. A cell tower generally has three sides, or sectors, each oriented in a distinct direction; a phone's connection to a particular sector at a specific time indicates that it was within the coverage area for that sector and receiving a stronger signal from it than from any other nearby cell towers. By mapping connections over time, Orlando can infer direction and movement patterns of a cellphone. In other words, Orlando cannot "exactly pinpoint the exact spot of a device" based on CDRs, but he can tell which tower and which sector of that tower a phone used and "provide [his] opinion on the footprint, or the coverage area, of that tower." The tower a phone connects to depends on which tower provides the best signal, so a phone does not always connect to the tower that is geographically closest.

{¶ 131} In this case, Orlando looked at six phone numbers belonging to four of the codefendants: a number ending in 5488 that was associated with Garcia, a number ending in 3126 that was associated with Carrissa, numbers ending in 9229 and 4908 that were associated with Walker, and numbers ending in 9020 and 8775 that were associated with Kohlhofer. He reviewed records for December 3 and 4, 2022.

{¶ 132} The CDRs from Garcia's phone showed that he used a cell tower in Michigan from 9:04 to 9:33 p.m. on December 3. After that, from 9:39 to 9:44 p.m., his phone used a tower just across the Ohio line, first using the west sector, then using the south sector. Beginning at 9:47 p.m., Garcia's phone used a tower in Oregon, near Seaman Road, where he lived. According to Orlando, this showed that Garcia's "phone

39.

is moving" because the phone "started up using a tower in Michigan. It used two different sides of a tower after that in Ohio that would be indicative of the device moving in a southern nature, and then ultimately that phone used a tower down . . ." in Oregon. The CDRs also showed that the phone numbers associated with Garcia, Kohlhofer, and Walker were all communicating with each other, Kohlhofer's phones were using a tower near 3015 Chase Street, and all three people's phones were using separate towers.

{¶ 133} From 10:08 to 10:13 p.m., Garcia's phone used a tower closer to 507 Maumee Avenue, first using the north sector, then using the south sector. From 10:15 to 10:33 p.m., Garcia's phone used the tower nearest 507 Maumee, which was an omnidirectional tower that did not have sectors. This showed "in totality movement of [Garcia's] phone, moving closer to the 507 Maumee Avenue . . . ." After 10:30 p.m., Walker's 4908 phone moved away from using the tower near 3015 Chase, which Orlando said was "indicative of that phone moving in the same general direction as [Garcia's] phone towards the general area of that 507 Maumee Avenue." The CDRs also showed that the phone numbers associated with Garcia, Kohlhofer, and Walker were all continuing to communicate with each other, and Kohlhofer's 9020 phone continued to use the tower near 3015 Chase Street.

{¶ 134} From 10:40 to 10:51 p.m., Garcia's phone continued to use the omnidirectional tower near 507 Maumee. Walker's phones used two sectors on a different tower near 507 Maumee. They first used the southern sector, which faced 507 Maumee, and then used the northwestern sector. From 10:55 to 10:56 p.m., while

40.

communicating with each other, Garcia's phone and Kohlhofer's 8775 phone used two of the same towers and three of the same sectors. The towers were not near either 507 Maumee Avenue or 3015 Chase Street. Orlando said that the phones' movement showed "[Garcia's] phone started towards . . . the general area of 507 Maumee Avenue, and then it ultimately moved and was using the same towers and the same sides of the towers as [Garcia's] phone while it was moving." To him, that was "indicative of the devices moving in the same general direction during that timeframe." He also noted that there were "connections particularly between" Garcia's phone and Kohlhofer's phone.

{¶ 135} From 11:00 p.m. to midnight, Garcia's, Kohlhofer's 8775 phone, and Walker's 4908 phone were using different towers and different sectors, which were all "the towers that are surrounding in the middle of that, that 3015 Chase Street." Orlando concluded that, during this period, "if you look at those connections, again, we see that there are connections between those phones. So those phones have traveled now towards that general area, 507 Maumee. They left that area, traveled away, and now they are bouncing off different towers and sectors around that 3015 Chase Street and continuing to speak."

{¶ 136} Between midnight and 4:00 a.m. on December 4, Kohlhofer's phones and Walker's 4908 phone were "fairly stationary, still, in connection and staying close to that general area of 3015 Chase Street." Garcia's phone, while communicating with Kohlhofer's and Walker's phones, was using a tower near Seaman Road in Oregon.

41.

{¶ 137} Orlando also looked at cellphone activity from 11:25 p.m. on December 4 to 1:07 a.m. on December 5. He found that Kohlhofer's 9020 phone and Walker's 4908 phone each used towers near 3015 Chase Street. Garcia's phone used two towers, one in Oregon and one near Detroit Avenue.

{¶ 138} On cross, Orlando said that a phone using the omnidirectional tower near 507 Maumee simply meant that the phone was "using that tower that provides coverage to that area including that residence." He was not able to pinpoint where the device was. Phones can store geolocation information that can be physically downloaded from the device, which could give more precise locations than the general areas he was able to provide. He was not given any geolocation information regarding this case. He admitted that he could not say that Kohlhofer was in any of the locations where his phones pinged the cell towers because he "map[s] out the device records, not the person records." Regarding the 10:40 to 11:00 p.m. timeframe when Orlando thought that the records were indicative of Kohlhofer's and Garcia's phones moving in the same direction, he admitted that he "can't pinpoint or say if they were together or apart, but [he] can say through the use of the towers they were moving in the same general direction during that time."

{¶ 139} Orlando clarified that voice contacts between cell phones could mean that one phone called the other and went to voicemail but did not have any actual communication with the other phone's owner. When he referred to contact or communication between the phones, he meant that "those devices either made an outgoing call to that other phone or received an incoming call from that other phone." He

42.

was unable to tell from the CDRs how long any voice calls between cell phones were. He said that the CDRs would note if a call went to voicemail.

{¶ 140} Orlando did not physically look at any of the cell phone towers involved in this case because the murder happened two years earlier, so he could not say that the towers he might have seen in 2024 were the same towers that existed and were in the same condition as they were in 2022. Therefore, he did not know if a cell phone tried to connect to a different tower but was unable to because of mechanical failure. He was also unaware of any error or accuracy rates related to the towers. And he was unable to go out and measure the actual signals from the towers to provide "the actual footprint rather than just that sector."

{¶ 141} Orlando conceded that a phone might not always use the tower closest to it, but a phone would always be within the coverage area of the tower that it used. When counsel had Orlando review the locations of the towers that Kohlhofer's phones used the night of December 3, he conceded that the phones never used towers near 507 Maumee. However, there were no connections between either of Kohlhofer's phones and any other phone between 10:12 and 10:55 p.m., so Orlando had no data to map out within that timeframe. If Kohlhofer had made a phone call while he was near 507 Maumee, his phone would have pinged off one of the towers near the Maumee address, not one of the towers further north.

43.

## 8. Detectives' testimony

{¶ 142} TPD detective Roy Kennedy testified that he became involved in this case on December 9, 2022, while it was still a missing persons case. The missing persons detective brought him into the case because of the suspicious circumstances of the boys' disappearance and the fact that this was not a typical teenage runaway case.

{¶ 143} He began his investigation by reviewing some Facebook messages, in which a person named Ni No was communicating with one of the boys about sending him an Uber. Detectives later identified B.W. as Ni No. Kennedy also knew that the boys were last seen at Maumee Bay State Park, so he obtained surveillance video from the hotel at the park, which showed K.P. and K.W. getting into a silver SUV. Kennedy used Flock cameras—cameras that read cars' license plates—to identify the vehicle and trace it back to the Uber driver. The Uber driver confirmed that she had picked up and dropped off the boys but did not know the exact address of where she had left them.

{¶ 144} Based on the evidence they gathered through December 9, 507 Maumee Avenue was the last place the boys had been seen, so the detectives obtained a warrant to search the house. They found and collected live cartridges for a handgun on top of a cabinet next to the back door in the kitchen and a small piece of glass with what appeared to be blood on it in a utility room in the basement. Kennedy did not see evidence of recent cleaning or any other bloodstains in the house. Police also seized some marijuana and packaging for marijuana. The drug evidence ended up being important because detectives learned through their investigation that the boys' murders "may have been

44.

retaliation for the boys had been stealing from drug dealers[,]" including Gingrich, Garcia, Kohlhofer, and Walker. In Kennedy's experience, marijuana-related disputes frequently led to violent crimes.

{¶ 145} When the investigation of this case evolved from a missing persons investigation to a kidnapping investigation, Marchyok took over lead detective responsibilities, and Kennedy took on a role that involved coordinating with other agencies to "employ as many resources as we could to try to find [the boys]."

{¶ 146} When Kennedy went to Garcia's house on December 9, Garcia allowed him to search the house and another house he owned to see if the boys were there. They were not.

{¶ 147} Kennedy eventually determined that Gingrich, Carrissa, Crystal, Garcia, Rivera, and B.W. lied in their initial statements to the police. Gingrich, Carrissa, Crystal, and B.W. continued to lie to Kennedy during their formal interviews with the police, which he knew because their statements were "wildly inconsistent with each other's" and did not match up with the direct evidence the police had.

{¶ 148} About a week after the boys were reported missing, TPD decided to involve the FBI because "everything [they] were finding so far was obviously very suspicious." This led to the FBI's evidence recovery team excavating the burned and demolished house at 3015 Chase Street. It also allowed the police quicker access to cellphone data.

45.

{¶ 149} Detectives learned through their investigation that the boys might have been loaded into a black Chevy Impala. In response, they seized a black Impala that was parked in front of Walker's house.

{¶ 150} Although Kennedy classified pistol whipping and stomping someone as "serious" in that they had the potential to cause significant injuries, that did not mean that such injuries would automatically produce a lot of blood.

{¶ 151} On cross-examination, Kennedy admitted that some throw rugs in the basement had been removed between December 3, when Don took a picture of the boys tied up in Gingrich's basement, and December 9, when Kennedy took pictures while executing the search warrant for Gingrich's house.

{¶ 152} He confirmed that Garcia lied about taking a gun to Gingrich's house and about hitting the boys with a gun; Gingrich lied about not seeing Garcia recently; and Carrissa lied. He did not recall Don lying. Although Garcia lied in his first two interviews, Kennedy believed he was truthful after that because his statements were "consistent with physical evidence, phone data evidence, and other statements made by others that [Kennedy] believe[d] could not have been worked out ahead of time."

{¶ 153} Kennedy admitted that he interviewed Gingrich, Garcia, Don, B.W., Rivera, Carrissa, and Crystal, and not one of them was the first to bring up the names Brett Kohlhofer or Charles Walker during their interviews (i.e., Kennedy mentioned Kohlhofer's and Walker's names first). He then revised his testimony to say that he

46.

remembered being the first to name Kohlhofer and Walker in Gingrich's and Carrissa's interviews but did not remember doing so in Garcia's interview.

{¶ 154} Officers obtained video footage from somewhere on Maumee Avenue, but Kennedy was not sure which house.

{¶ 155} Kennedy did not interview "Anya and Jared," who were allegedly at 507 Maumee when the boys were there and was not aware of anyone else in the department interviewing them.

{¶ 156} Kennedy knew of Crime Stoppers tips coming in about this case, but he could not recall if he was involved in following up on any of them.

{¶ 157} Kennedy did not interview any of the people who supposedly went to Garcia's house on December 3 and did not recall what Garcia did with his gun.

{¶ 158} Kennedy confirmed that someone who alleged that they had information about the case and denied being housed with Garcia at the jail was, in fact, housed with Garcia at the jail.

{¶ 159} Kennedy was not aware of any forensic evidence that confirmed that the boys were alive when they left 507 Maumee Avenue on December 3.

{¶ 160} TPD detective Paul Marchyok was the lead detective on this case. He testified that he became involved in this case on December 9, 2022, while it was still a missing persons case. He began his investigation by reviewing the Facebook messages between one of the boys and Ni No, reviewing the surveillance video from Maumee Bay, and interviewing A.E. and K.P.'s half-brother.

47.

{¶ 161} After that, he helped execute the search warrant at 507 Maumee Avenue. He noted that a small piece of glass with apparent blood on it was collected from the basement, but the DNA results did not connect the blood to K.P., K.W., or any of the codefendants in this case. Officers did not find any other blood evidence inside the house. Marchyok did not see obvious signs of cleaning in the house.

{¶ 162} Detectives interviewed Gingrich and Carrissa on December 9 and got permission to download the contents of their cellphones. Based on the cell records and evidence from Flock cameras, detectives knew that Gingrich and Carrissa had lied in their interview, so they decided to bring them in for another interview. Detectives also interviewed Crystal and B.W. at the same time. Following these interviews, all four codefendants were arrested for obstructing justice.

{¶ 163} The next major step in Marchyok's investigation was finding 3015 Chase Street. The police received information that the boys might be in the basement of a burned, collapsed house. Before receiving that information, they had begun looking into Kohlhofer, Walker, and Garcia. In looking into Kohlhofer, they learned that he owned several houses on Chase Street through an LLC, and that a house on Chase Street had recently burned down, which matched the information they had received about the boys' potential location.

{¶ 164} When Marchyok went to Chase Street to investigate the burned down house, he saw a black Impala, which officers were looking for based on other information they had received, parked on the street near the house where Walker lived. The Impala

48.

was registered to Walker. Marchyok had the Impala towed so it could be searched. He also contacted the owner of 3015 Chase to get consent to search the house, contacted the FBI about excavating the house, and contacted two organizations with cadaver dogs to search the house.

{¶ 165} After the cadaver dogs alerted to remains at 3015 Chase, Marchyok obtained a search warrant for the house. After that, the FBI team conducted its search of the demolished house.

{¶ 166} People working on the investigation attempted to find surveillance footage from the area around 3015 Chase and 507 Maumee, but were unsuccessful, with the exception of the videos from one house on New York Avenue.

{¶ 167} The day of the excavation, Marchyok decided to bring Garcia and Rivera in for questioning. He also sought a search warrant for their house and seized their gray Ford F-150. The DNA swabs taken from inside the F-150 were not sent to BCI for testing because of BCI's rules about the number of items it will test in a case.

{¶ 168} After December 15, Marchyok was getting more phone records, including records from Kohlhofer's and Walker's phones. Using that and the other information the police had gathered, the prosecutor's office sought indictments.

{¶ 169} Marchyok was not able to find any 911 calls or police reports related to burglaries of any of the homes that Kohlhofer owned on Chase Street.

{¶ 170} Through his investigation, Marchyok knew that the boys left Maumee Bay at 8:14 p.m., arrived at Gingrich's by 8:52 p.m., and last had communication with

49.

someone at 9:14 p.m. The picture of the boys tied up in the basement was taken at 9:28 p.m.

{¶ 171} Marchyok found Orlando's report regarding cellphone towers significant for several reasons. First, he determined that Orlando's map of the phones from 9:00 to 10:00 p.m. "matched up" with his investigative findings. For example, Garcia told detectives that he went to Michigan to buy marijuana, and the cellphone map showed that he was using his phone in Michigan around that time. He also found the "I'm a send bro just tell me where" text from Kohlhofer to Garcia significant because it happened after at least four phone connections between the two men. He found Orlando's map of the phones from 10:00 to 10:40 p.m. significant because "[i]t shows movement of the phones and where people are going." Flock cameras also corroborated Walker's movement toward the 3000 block of Chase Street.

{¶ 172} Marchyok reviewed the surveillance video from a house at the corner of Chase Street and New York Avenue. In one clip, a dark-colored car that Marchyok believed was Walker's Impala drove down New York and turned onto Chase at around 10:10 p.m., which was after the time that Walker's Impala was captured on a nearby Flock camera. Another camera from the same house shows the same car driving down Chase and reversing into a driveway that Marchyok said was Walker's house. At around 10:30 p.m., the dark-colored car leaves Walker's driveway and drives down Chase toward New York and turns on New York, which Marchyok said matched with cell tower movements of Walker's phones. Around 11:03 p.m., two vehicles that Marchyok

50.

believed were Walker's Impala and Garcia's F-150 head southbound on New York and turn from New York on to Chase. They both drive down Chase past Walker's house.

{¶ 173} On December 4, around 12:06 a.m., a dark-colored car drives down New York, turns on to Chase, and backs into Walker's driveway. Around 1:40 a.m., the motion-sensor light outside of Walker's house comes on, and soon after a person can be seen walking around the yard and down the alley beside 3015 Chase. Around 1:44 a.m., what appears to be the same person walks out of the alley and crosses the street to the side of Chase where Kohlhofer's and Walker's houses are. Soon after, the motion-sensor light outside of Walker's house turns on again. Around 1:49 a.m., the light outside of Walker's house turns on and a person again walks from the direction of Walker's house toward 3015 Chase, turns down the alley beside 3015 Chase, and walks out of the frame. A few minutes later, the motion light turns on again and another person walks toward 3015 Chase from the direction of Kohlhofer's and Walker's houses and turns down the alley beside 3015 Chase. Around 2:00 a.m., two people walk out of the alley beside 3015 Chase, cross the street, and walk toward Kohlhofer's and Walker's houses. Soon after, the motion light outside of Walker's house turns on. A dark-colored car leaves Walker's house around 2:07 a.m. Around 2:17 a.m., a dark-colored car drives into the alley beside 3015 Chase. After the car is out of the frame, what appears to be brake lights reflect off of the houses beside the alley. Around 2:22 a.m., a dark-colored car drives down Chase and backs into Walker's driveway.

51.

{¶ 174} Just before midnight on December 5, there is a bright flash of light from the alley beside 3015 Chase. Shortly after, flickering light that quickly intensifies in brightness comes from the alley.

{¶ 175} On cross, Marchyok confirmed that no DNA profiles, not even Walker's, were found in Walker's car. He did not see any evidence of Walker cleaning out his car on the video from the house on New York Avenue. He also confirmed that they did not get any DNA evidence from any of the other items they sent to BCI for testing. He did not know what results might have been on items that were not tested.

{¶ 176} The police seized an infotainment system from Garcia's truck but had not received any testing results from that as of the time of trial.

{¶ 177} Marchyok confirmed that Garcia, Gingrich, Carrissa, Don, P.Y., and B.W. (among others) had lied about their involvement in the case at some point. He also confirmed that Gingrich, Carrissa, Don, P.Y., and B.W. discussed what they would say if they were questioned by the police. And that Garcia's story kept evolving.

{¶ 178} The police did not have any video that showed something that looked like Walker's Impala in the area of 507 Maumee.

{¶ 179} Marchyok "did not get any useable geo location data from" Kohlhofer's or Walker's phones and any location data from other codefendants' phones did not put them in the 3000 block of Chase Street.

{¶ 180} The phones associated with the phone numbers attributed to Kohlhofer in Orlando's report were not on Kohlhofer's person when he was arrested. Marchyok

52.

believed that Kohlhofer made the phone calls noted in Orlando's report because the phones were registered to him.

{¶ 181} When officers executed the search warrant at Kohlhofer's house, there was a red pick-up truck parked in the driveway and Kohlhofer's driver's license was pictured on the front seat of the truck.

{¶ 182} Marchyok clarified that the houses with broken windows were the house on Patriot Street and Walker's house on Chase Street. There were no police reports filed regarding break-ins at Kohlhofer's Chase Street house, Walker's house, or Garcia's mother's house, or regarding Gingrich's gun.

{¶ 183} Regarding the "I'm a send bro" text, Marchyok said that you can infer that Kohlhofer was going to send someone, not that he was going somewhere. Based on his investigation, he believed that Kohlhofer meant Walker because Walker went to 507 Maumee that night.

{¶ 184} Marchyok acknowledged that there was another Impala that showed up in the surveillance videos from Chase Street, but said that it was a lighter color, which showed up as lighter on the nighttime videos. He was convinced that Kohlhofer was in the truck that backed into the driveway on Chase.

{¶ 185} Defense counsel also reviewed some of the surveillance videos with Marchyok. On December 3, around 12:35 p.m., a red pickup truck pulls into Kohlhofer's driveway. Around 12:55 p.m., the red truck leaves Kohlhofer's house. Later that evening, around 6:44 p.m., a truck pulls into Kohlhofer's driveway. Around 10:01 p.m.,

53.

the truck leaves the driveway. Marchyok did not see the truck return to Kohlhofer's house that night.

{¶ 186} The next day, December 4, around 11:46 a.m., a red truck pulls up outside of Kohlhofer's house, and someone gets out and walks up to the house. Two people walk out of the house and leave in the red truck around 11:53 a.m. Shortly after, around 12:12 p.m., a silver F-150 that Marchyok believes is Garcia's pulls up to Kohlhofer's house. The red truck is not at the house when Garcia's truck arrives. The truck returns around 12:20 p.m. and leaves again around 12:38 p.m., while Garcia's truck is still at the house. Garcia's truck leaves around 1:08 p.m.

{¶ 187} Later that day, around 4:45 p.m., the red truck pulls into Kohlhofer's driveway; it stays there until around 4:49 p.m. A truck returns to the house around 5:35 p.m. and leaves again around 5:38 p.m. Around 7:20 p.m., "another large vehicle, possibly a truck" pulls into Kohlhofer's driveway. It leaves around 8:16 p.m. and does not return at all that night or into the early hours of December 5.

{¶ 188} During Marchyok's testimony, Walker and Kohlhofer attempted to question him about a text message exchange between Don and his girlfriend.[3] The messages say,

> Don: Bro really ?)? This shits foul bro

---

[3] There are two sets of text messages that Walker attempted to use as evidence at trial and proffered into the record: (1) texts between Don and his girlfriend, and (2) texts between Don and a contact named Brown. Because Kohlhofer does not make any arguments regarding the "Brown" text messages, we do not address those messages in our opinion.

54.

Don: Bro like wake tf up you really fell asleep and left me and forgot about me made me sleep were two people died and shit

Don: Please come get me a soon as you get up I miss you and love you so much I don't ever wanna be away from you I value your love alot and know we're your coming from

Girlfriend: I'm up so you want me to come

Girlfriend: I'm going backTo bed bro like you just don't know when to stop like fr

Don: I just got up I went to bed I'm sorry yes are you coming ?

Don: Pull in the back whebhere

Girlfriend: I'm not staying so are you ready

Don: Your not gonna come in ?  I gotta wait for ris and Corey to get up to lock the door ?

{¶ 189} The state objected to the text messages because they were hearsay that did not fall within any hearsay exception.  Kohlhofer and Walker argued that they were not offering the messages for the truth of the matter asserted (i.e., the mention of people dying at the house was "completely collateral to the actual reason [Don] sent the messages") and excluding the messages would prevent them from presenting a defense. The trial court ultimately decided that the messages were inadmissible because they were hearsay and did not qualify as a statement of a party opponent, statement of a coconspirator, present sense impression, excited utterance, then existing mental state, or statement against interest.

{¶ 190} After Marchyok testified, the state rested.

### B. Kohlhofer's case

{¶ 191} When the state rested, Kohlhofer moved for acquittal under Crim.R. 29, which the court denied.  After the court denied his motion, the defense presented the testimony of Melanie Gard of the Ohio Narcotics Intelligence Center and Carla Koch, Kohlhofer's mother.

{¶ 192} Gard testified that she was involved in analyzing the cellphone extraction reports in this case.  One analysis looked at the number of phone calls the codefendants' phone numbers made to each other during three periods:  November 18 to December 2, 2022 (before the crime), December 3 to 5, 2022 (during the crime), and December 6 to 15, 2022 (after the crime).  Gard was unable to say who was using the phones when they made the calls.

{¶ 193} On a timeline that Gard compiled, she noted that Walker's vehicle left his house on Chase Street at 10:05 p.m. on December 3.

{¶ 194} Kohlhofer's phones and Garcia's phones spent a total of about two minutes and 42 seconds communicating with each other between 9:22 and 11:07 p.m. on December 3.  Gard could not recall if she was asked to look at phone calls made earlier that day.

{¶ 195} On cross-examination, the state asked Gard about several charts in her report.  In the first three, she broke down the analysis of the number of phone calls the codefendants' phone numbers made to each other during the periods before, during, and after the crimes.  The takeaways from these charts are (1) the group averaged 9.06 calls

56.

per day from November 18 to December 2, (2) it averaged 27.67 calls per day from December 3 to 5, and (3) it averaged 9.8 calls per day from December 6 to 15.

{¶ 196} In the fourth chart, Gard detailed the calls between codefendants' phones on December 3, 2022. The first call was a call from one of Gingrich's phones to Garcia's phone at 9:22 p.m. The last call was a call from Garcia's phone to the same Gingrich phone at 11:07 p.m. The chart also showed that both of Kohlhofer's phones placed outgoing calls to Garcia's phone over the course of the evening.

{¶ 197} The fifth chart showed several calls between Kohlhofer and Garcia beginning at 9:39 p.m.; a text from Kohlhofer to Garcia at 9:48 p.m. saying, "I'm a send bro just tell me where"; a phone call from Garcia to Kohlhofer at 9:50 p.m.; a phone call from Kohlhofer to Walker at 9:51 p.m.; a phone call from Walker to Garcia at 9:52 p.m.; a text from Garcia to Rivera at 9:57 p.m. telling her that he has to leave; and a note that surveillance footage shows a vehicle leaving the area of Walker's home at 10:06 p.m.

{¶ 198} The sixth chart detailed calls between the codefendants' phones on December 4 and 5, 2022. The first call was a call from one of Kohlhofer's phones to Garcia's phone at 12:23 a.m. The last call was a call from Rivera's phone to Garcia's phone at 5:58 p.m.

{¶ 199} After Gard testified, Kohlhofer called Carrissa and Don, but they each invoked their Fifth Amendment right to remain silent and right against self-incrimination.

{¶ 200} Finally, Kohlhofer called Koch. She first testified about M.N. and M.B., two of her grandsons. She described M.N. as "always right no matter how wrong he is.

57.

You can't teach him anything[,]" while M.B. "is more quiet, and he'll listen, and he'll do what is asked." She said that Kohlhofer "did everything" for M.N. and M.B., which included taking them out on a boat, taking them on vacation, buying them school clothes, and buying them shoes.

{¶ 201} Koch knew K.P. because he was friends with M.B.; they spent most of the summer of 2022 at Koch's house. After November 1, 2022, M.N., M.B., and K.P. were not allowed at Koch's home because she had found a gun in the house.

{¶ 202} Although Kohlhofer owned three houses on Chase Street, he did not live there. He lived on Patriot Drive in Point Place. He used one of the three houses on Chase for selling marijuana.

{¶ 203} In 2022, Kohlhofer drove a red truck. He let other people drive it, but he was generally the one who drove it.

{¶ 204} Regarding Kohlhofer's finances, Koch said that "if Brent wanted something Brent got it" and he did not struggle to pay bills.

{¶ 205} Koch did not think that the neighborhood around Chase Street was violent or dangerous.

{¶ 206} She knew of attempted break-ins at Kohlhofer's and Walker's Chase Street houses. M.N. told Koch that he committed the break-ins.

58.

## C. Outcome and Sentencing

{¶ 207} The jury found Kohlhofer guilty of aggravated murder in count 2, both counts of murder, and both counts of kidnapping, and not guilty of aggravated murder in count 1.

{¶ 208} At the sentencing hearing, the trial court determined that counts 2, 4, and 6 (related to K.W.) merged and counts 3 and 5 (related to K.P.) merged. The state chose to proceed to sentencing on counts 2 and 3. The court sentenced Kohlhofer to life in prison without the possibility of parole for count 2 and 15 years to life in prison for count 3.

{¶ 209} Kohlhofer now appeals, raising two assignments of error:

    1. The Manifest Weight of the Evidence Does Not Support Mr. Kohlhofer's Conviction.

    2. The Trial Court Erred and Abused its Discretion by Refusing to Admit Exculpatory Text Messages.

## II. Law and Analysis

### A. Kohlhofer's convictions are not against the manifest weight of the evidence.

{¶ 210} In his first assignment of error, Kohlhofer contends that his convictions are against the manifest weight of the evidence. He argues that the state failed to prove all of the elements of the crimes beyond a reasonable doubt. Specifically, he contends that the state failed to show that he committed the murders or kidnappings, that he acted with purpose, or that he caused K.P.'s or K.W.'s death, and the only evidence tying him to the crimes was Garcia's "incredibly unreliable" testimony.

59.

{¶ 211} The state responds that (1) Kohlhofer's arguments relate to the sufficiency of the evidence, not the weight of the evidence, and we should disregard his sufficiency arguments because he did not separately assign them as error;[4] (2) even if we do not disregard the sufficiency arguments, it presented sufficient evidence to support every element of each offense; (3) Kohlhofer's convictions are not against the weight of the evidence because the jury could choose to believe Garcia's testimony, and portions of his testimony were corroborated by Gingrich, cell tower records, and Flock photos; and (4) inconsistencies in the evidence do not entitle Kohlhofer to reversal on manifest-weight grounds.

{¶ 212} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.) citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the

---

[4] Kohlhofer makes clear in his reply brief that he is only raising a manifest-weight challenge—not a sufficiency challenge—so we will not address the sufficiency of the evidence.

60.

exceptional case in which the evidence weighs heavily against the conviction."
*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*, 175 (1st Dist. 1983).

{¶ 213} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 214} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. To be sure, there are some inconsistencies in the testimony. For example, although Garcia testified that Kohlhofer called him when he arrived at 507 Maumee, Orlando testified that Kohlhofer's phones never used cell towers closer than about five miles away from 507 Maumee; there was no evidence of duct tape or duct tape residue on or near the boys' bodies; and the injuries to the boys' bodies do not match Gingrich's and Garcia's stories that Kohlhofer and Walker "stomped" on them in the alley. However, the testimony of a single witness, if believed, is sufficient to support a conviction. *State v. Sherman*, 2024-Ohio-5354, ¶ 172 (6th

61.

Dist.). Here, the jury chose to believe Gingrich and Garcia, despite their history of lying to the police. As the sole finder of fact, the jury was entitled to believe their stories, *Caudill* at ¶ 62, and we are not convinced that the jury lost its way in making those credibility determinations. Moreover, the circumstantial evidence used to convict Kohlhofer need not be "irreconcilable with any reasonable theory of the accused's innocence," as Kohlhofer claims. *See State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus ("When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.").

{¶ 215} In short, given the evidence before it, the jury did not clearly lose its way by finding Kohlhofer guilty. Accordingly, Kohlhofer's convictions are not against the manifest weight of the evidence, and his first assignment of error is not well-taken.

**B. The trial court improperly excluded the text messages from Don, but the error was harmless.**

{¶ 216} In his second assignment of error, Kohlhofer argues that the trial court improperly excluded text messages between Don and his girlfriend, which, he claims, was inconsistent with its treatment of text messages that the state offered as evidence and denied his right to a fair trial. He contends that the messages qualify as a statement against interest under Evid.R. 804(B)(3) and served the nonhearsay purpose of explaining the detectives' investigation.

62.

{¶ 217} The state responds that the trial court did not abuse its discretion by excluding the text exchange because the messages were inadmissible hearsay.

{¶ 218} Hearsay is a statement made by someone, other than the declarant, while testifying that is "offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  An out-of-court statement is not considered hearsay and is admissible if it is offered for a different purpose, however.  *State v. Osie*, 2014-Ohio-2966, ¶ 118.  Those purposes include showing the statement's effect on the listener and explaining a law enforcement investigation.  *Id.* at ¶ 122; *State v. Ricks*, 2013-Ohio-3712, ¶ 21.  "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay."  *State v. Richcreek*, 2011-Ohio-4686, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7 (1st Dist. 1997); and *State v. Sorrels*, 71 Ohio App.3d 162, 165 (1st Dist. 1991); Evid.R. 802.

{¶ 219} Here, Kohlhofer attempted to cross-examine Marchyok about Don's statement that his girlfriend "made [him] sleep were two people died and shit[.]" Using that statement to elicit its effect on Marchyok and his investigation of this case was a permissible, nonhearsay purpose.  *Osie* at ¶ 122; *Ricks* at ¶ 21; *State v. Crocker*, 2015-Ohio-2528, ¶ 50 (4th Dist.).  Indeed, allowing the defense to ask Marchyok about Don's text message would have been no different than permitting the state to ask him about text messages that Walker's girlfriend sent about her house being broken into—which the

63.

court did allow.  Because the trial court prevented the defense from inquiring about Don's text messages to his girlfriend, the court erred.

{¶ 220} This error was harmless, however.  Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights . . . ."  Crim.R. 52(B). The state bears the burden of proving that an error did not affect a defendant's substantial rights.  *State v. Moore*, 2021-Ohio-765, ¶ 37 (6th Dist.), citing *State v. Morris*, 2014-Ohio-5052, ¶ 23; and *State v. Perry*, 2004-Ohio-297, ¶ 15.  An error by the trial court in excluding evidence "is harmless 'if such evidence would not negate the overwhelming proof of defendant's guilt.'"  *State v. Johnson*, 2011-Ohio-994, ¶ 64 (3d Dist.), quoting *State v. Gilmore,* 28 Ohio St.3d 190, 193 (1986); *State v. Smith*, 2013-Ohio-746, ¶ 20 (3d Dist.) ("The improper exclusion of evidence is harmless where the remaining evidence provides overwhelming proof of a defendant's guilt.").  In other words, the error is harmless "'if the jury would not have rendered a different verdict had the excluded evidence been admitted at trial[.]'"  *State v. Fudge*, 2018-Ohio-601, ¶ 40 (10th Dist.), quoting *State v. West*, 2006-Ohio-6259, ¶ 9 (10th Dist.).

{¶ 221} In this case, the jury would not have returned a different verdict if Kohlhofer had been allowed to ask Marchyok about Don's text message claiming that he slept "were two people died and shit."  Contradicting that single piece of evidence was (1) Gingrich's testimony that Kohlhofer was one of the two people who took the boys from his house; (2) Garcia's testimony that Kohlhofer was one of the two people who took the boys from Gingrich's house; (3) cell tower and video evidence that corroborated

64.

parts of Garcia's story; (4) cell tower evidence showing two phones registered to Kohlhofer contacting Garcia frequently over a short period of time on the evening of December 3; (5) video evidence of two people walking from the area of Walker's house and walking around 3015 Chase Street the morning of December 4, just hours after the boys were kidnapped; (6) video evidence of a dark-colored car driving from Walker's house to the alley beside 3015 Chase Street the morning of December 4, just hours after the boys were kidnapped; and (7) evidence that Kohlhofer thought that K.P. had broken into his house and was angry enough to threaten to burn down K.P.'s house.

{¶ 222} Considering all of this, we find that the trial court's failure to allow evidence of the text messages was harmless beyond a reasonable doubt. Therefore, Kohlhofer's second assignment of error is not well-taken.

### III. Conclusion

{¶ 223} Based on the foregoing, the June 3, 2024 judgment of the Lucas County Court of Common Pleas is affirmed. Kohlhofer is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

65.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____

_____
JUDGE

Myron C. Duhart, J.
_____

_____
JUDGE

Charles E. Sulek, P.J.
_____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.